[No. 4101. Decided May 3, 1902.]

KEITH W. DUNLOP, *Appellant,* v. JOHN W. THOMAS *et al., Appellants.*

BANKRUPTCY — FRAUDULENT CONVEYANCES — INADEQUACY OF CONSIDERATION.

A sale of a stock of goods by an insolvent debtor for about sixty per cent. of its cost price does not constitute such a grossly inadequate consideration as to put the purchaser, who was ignor-

ant of the seller's insolvency, on inquiry as to the seller's intention to defraud creditors, and thereby entitle the trustee in bankruptcy to recover the property under § 67, subd. e, of the national bankruptcy act, where it appears that the merchandise, part of which had been carried on the shelves for several years, was of that character that it soon passed out of style, and there was testimony of competent witnesses to the effect that stocks of that kind would be closed out at from 45 to 60 per cent. of their cost price.

SAME — ACCOUNTING BY PURCHASER.

In such a case the purchaser cannot be compelled to account to a trustee in bankruptcy for the difference between the actual value of the stock and the price paid.

SAME — PREFERENCES.

The payment by an insolvent merchant on disposing of his stock of goods of the money due from him to one of his clerks for wages and money borrowed would not constitute a preference, which the trustee in bankruptcy could set aside, under § 60, subd. b of the national bankrupt act, providing that if a bankrupt shall have given a preference within four months before the filing of a petition and the person receiving it shall have had reasonable cause to believe that it was thereby intended to give a preference, the property or its value may be recovered from such person, when it appears that the clerk had nothing to do with the books and accounts of the firm and was ignorant of his employer's indebtedness.

Appeal from Superior Court, Yakima County.—Hon. RALPH KAUFFMAN, Judge *pro tem.* Reversed.

*Whitson & Parker* and *H. B. Rigg,* for plaintiff.

*Graves & Englehart* and *Ira M. Krutz,* for defendants.

The opinion of the court was delivered by

WHITE, J.—This is an action by the trustee of an insolvent bankrupt to recover possession of a stock of goods sold by the bankrupt to one of the defendants, and to obtain judgment against one of the other defendants on the ground that he was a creditor of the bankrupt, and a

preference was given to him by the bankrupt in the payment of his claim against the bankrupt. Both plaintiff and defendants appeal.

For some years prior to December 7, 1899, the defendant Thomas was engaged in the mercantile business in the city of North Yakima, and during the same period the defendant Braden was a clerk in the Thomas store, and, so far as the testimony shows, did not have charge of the books or accounts of the defendant Thomas, or any knowledge thereof. During the same period, also, the defendant Keck was engaged in the hardware business on the same street, and next door to Thomas' store. A week or several days prior to the above date, the defendant Thomas approached the defendant Keck with a view to selling to the latter his entire stock in trade, and negotiations to that end were pending until December 7, 1899, at which time the defendant Thomas, by a bill of sale, transferred to the defendant Keck his entire stock of goods for the sum of $5,475.25, which was paid as follows: $3,500 cash, and $1,975.25 by promissory note executed by the defendant Keck to the defendant Braden, the same being the amount of a debt owed by the defendant Thomas to the defendant Braden, which Keck had assumed as a part of the purchase price, and the defendant Thomas was released therefrom. At the time this sale was made, an attorney or agent of Charles P. Kellogg & Co., of Chicago, who was the principal creditor of Thomas, was pressing Thomas for payment, and demanding the money, or that the goods in the store be turned over to Charles P. Kellogg & Co. It does not appear from the testimony that this fact was known to either Keck or Braden, or that they had any knowledge of any facts sufficient to put them upon inquiry as to this matter. The court below rendered a judgment against the defendant Keck, setting aside the conveyance

of the stock of goods, and directing that an accounting be had, and against the defendant Braden for the amount of the note. The plaintiff claims that he is entitled to a personal judgment against the defendant Keck for the sum of about $4,525, being the difference between the price paid by Keck to Thomas for the goods and the sum of $10,000, the amount the court below found the goods were worth when they were turned over to Keck. The court found that on the 7th day of December, 1899, the defendant Thomas was insolvent, and ever since has been and now is insolvent; that at that date the defendant Thomas was indebted to divers 'and sundry merchants in the sum of $12,-791.16, which was then and now is, largely in excess of his assets; that the value of the stock of goods, wares, and merchandise sold by Thomas to Keck at that date was the sum of $10,000, and the court found that the amount paid was a grossly inadequate consideration for the stock of goods. The court also found that at the time of the making of said bill of sale the defendant Thomas was indebted to defendant Braden in the sum of $1,975.50, for clerk hire and borrowed money,—about $465 of which was for borrowed money and the balance thereof for wages to such clerk at' the rate of $50 per month. The court also found that the defendant Thomas caused the defendant Keck to execute said promissory note to defendant Braden for the purpose of preferring the said Braden as a creditor, and the defendant Braden at the date had reasonable cause to believe, and did believe, that the defendant Thomas was insolvent, and that the giving of said note was intended by the said Thomas as a preference to the defendant Braden. The court refused to find that the defendant Keck had sufficient facts and circumstances called to his attention to put him upon inquiry as to the intent with which the defendant Thomas was disposing of

his stock of goods, and as to the debts of the said Thomas; and the court further found that, at the time the defendant Keck purchased said stock of goods and paid the consideration therefor, he had no notice or knowledge of the insolvency of the defendant Thomas, and had no notice or knowledge of any fact sufficient to put him upon inquiry as to such insolvency; that at the time of said purchase Keck had no notice or knowledge that Thomas, by said sale, intended to hinder, delay, or defraud any creditor of the said Thomas, and no notice or knowledge of any facts sufficient to put him upon inquiry as to the intent of said Thomas in making said sale, and that said Keck did not make said purchase for the purpose of aiding Thomas in defrauding his creditors, or with knowledge of any such intent upon the part of Thomas; that the only evidence of fraud upon the part of the defendant Keck in making said purchase is the inadequacy of the purchase price paid by him, the said Keck, for said stock of goods. The court decreed that the plaintiff was entitled to the possession of said stock of goods, and to an accounting from the defendant Keck for all goods sold by him since the transfer of the goods to him; and decreed that the trustee of the bankrupt apply the proceeds of the sale of said goods (1) to the expenses of the business, (2) to the payment of outstanding claims for goods purchased by the defendant Keck since said transfer and mingled with said goods; that the defendant Keck account for all his transactions in and about said business and said transfer, and in such accounting that he be credited with $5,475.50, the amount he paid for said goods, and his other disbursements on account of said business; that he be charged with the gross receipts, and if, on such accounting, there remained a debit balance, the trustee was to have judgment against the defendant Keck for such amount; if there be a credit

balance, the said defendant Keck to be paid out of the funds in the trustee's hands derived from the sale of the stock of goods after the claims for plaintiff's expenses and outstanding claims for goods purchased of Keck are paid. The court also decreed that the trustee was entitled to a judgment against the defendant Braden for the sum of $1,975.50, less $150, which he allowed to the defendant Braden, under the bankrupt act, for three months' salary as clerk, and rendered judgment for the balance of $1,-825.50 against Braden. Subdivision "e," § 67, of the bankrupt act of July 1, 1898, is as follows:

"That all conveyances, transfers, assignments, or incumbrances of his property, or any part thereof, made or given by a person adjudged a bankrupt under the provisions of this act subsequent to the passage of this act and within four months prior to the filing of the petition, with the intent and purpose on his part to hinder, delay or defraud his creditors, or any of them, shall be null and void as against the creditors of such debtor, except as to purchasers in good faith and for a present fair consideration; and all property of the debtor conveyed, transferred, assigned, or encumbered as aforesaid shall, if he be adjudged a bankrupt, and the same is not exempt from execution and liability for debts by the law of his domicile, be and remain a part of the assets and estate of the bankrupt and shall pass to his said trustee, whose duty it shall be to recover and reclaim the same by legal proceedings or otherwise for the benefit of the creditors. And all conveyances, transfers, or incumbrances of his property made by a debtor at any time within four months prior to the filing of the petition against him, and while insolvent, which are held null and void as against the creditors of such debtor by the laws of the state, territory, or district in which such property is situate, shall be deemed null and void under this act against the creditors of such debtor if he be adjudged a bankrupt, and such property shall pass to the assignee and be by him reclaimed and recovered for the benefit of the creditors of the bankrupt."

Conveyances which are null and void as against creditors under state laws and are not in good faith and for a present fair consideration, and none other, are fraudulent and void under the provisions of the bankrupt act.

We have examined the evidence in this case carefully, and we agree with the finding of the court below that there was no actual fraud on the part of the defendant Keck. We do not agree, however, with the finding that the purchase price paid by Keck for the stock of goods was a grossly inadequate consideration, or that Keck paid any less than the fair and probable value of the goods. This stock of goods consisted of clothing, hats, caps, and gentlemen's underwear, shoes, and a small quantity of rubber goods. From the evidence, a portion of these goods had been in the store for several years, a part of the original stock having been owned by parties who were in business before Thomas went into business, and who were bought out by Thomas. As to the original cost price of the goods in the store at the time of the sale, but two witnesses testified in the course of the trial, Braden and Thomas. The testimony shows that Braden had been a salesman of Thomas, and was perhaps more familiar with the stock of goods than any one else. He testified that the cost price of the goods sold to Keck by Thomas at the time of the sale was $8,000; that the witness Thomas told Keck previous to the sale that he had between eight and nine thousand dollars' worth in stock. Thomas testified indirectly as to the cost price of the stock by referring to an inventory taken January 1, 1899, and the amount of his sales and purchases between then and his sale to Keck. His inventory taken January 1, 1899, showed the cost price of the goods then on hand to be about $11,000. From January 1st to December 7th, the date of the sale to Keck, he purchased goods to the amount of $15,515.31, making a

total of $26,515.31 as the cost price of the goods on hand
January 1, 1899, and those purchased after that date and
previous to the sale to Keck. Out of this stock from January
1st to December 7th sales were made to the amount
of $17,514.15 in cash, and $200 or $250 on credit, making
a total of $17,714.15, approximately, in sales from the
gross amount of goods on hand and purchased after January
1, 1899. These sales were made at an advance of about
twenty per cent. on the cost price, which would leave the
cost price of the goods so sold $14,561.85. Deducting this
amount from the sum of $26,515.31, the total on hand
January 1st, and bought afterwards, leaves the sum of
$11,753.46 as the cost of the goods on hand at the date of
sale, according to Thomas' testimony. There is testimony
furnished by Thomas himself that, when desiring credit
from Charles P. Kellogg & Co., the value of his stock of
goods on February 4, 1897, was $4,171, on June 14, 1898,
was $9,366.62, and on January 18, 1899, was $10,220.55.
The inventory taken in 1899 is that upon which was
based the estimated value of the stock in his report to
Charles P. Kellogg & Co. when desiring from them further
credit. Under these circumstances we think that this
testimony should be weighed with a good deal of care, and
prudence requires us to make some deductions from the
estimate on this account. When offering the goods for sale
to Keck, Thomas estimated their worth at eight or nine
thousand dollars, and that, perhaps, was nearer correct
than his report to Charles P. Kellogg & Co. of $10,220.55.
Giving the plaintiff the benefit of every doubt, according
to the testimony the original cost price of the goods sold to
the defendant Keck was not much more than $11,000,
and, in our opinion, a preponderance of the testimony
shows that the cost price did not exceed eight or nine
thousand dollars. The condition of this stock of goods

at the time of the sale is detailed in the testimony of the witness Braden. The stock was badly broken, and a great part of it had been on hand for more than a year prior to the sale. It consisted of that class of goods which goes out of date soon. The witness Braden, who was very familiar with the quality and condition of the goods, and who appears to be fair in his testimony, and fully competent to give an opinion as to their value, says they were worth from 45 to 50 per cent. of their cost. The witness Vance, who had been engaged in the same line of business for some twelve years, testified that a stock of goods of that character was worth about 50 per cent. of the cost price. Witness Coffin, who was engaged in the same line of business for several years, testified that a stock like that would be closed out at about 50 or 60 cents on the dollar. The defendant Keck, who had been in charge of the stock for more than a year at the time of the trial, testified that he did not consider the stock worth what he paid for it. This is all the testimony bearing upon the value of the stock of goods, and it is not contradicted. If the testimony of the witness Braden as to the quantity or cost price of the stock was correct, Keck paid more than the goods were actually worth. If the outside estimate of the defendant Thomas is correct, based as it is on an inventory of an insolvent made for the purpose of having an extension of credit, then he paid a fair price for the stock and got none the best of the bargain. All are aware that a stock of goods like this has no fixed market value. The price it will bring depends entirely on circumstances. If the purchaser is to succeed the seller in business, he may pay a fair price. Other merchants engaged in the same line of business may purchase them to prevent them being thrown on the market as a bankrupt stock. Aside from this, they are like any other broken and shopworn goods,—worth whatever one can get

for them.    For this reason the court will always be ex-
tremely reluctant to set aside a sale of this kind.    The
most favorable rule to the claim of the trustee here is that
laid down by Wait in his work on Fraudulent Convey-
ances, at § 232, where he says:

"Mere proof of inadequacy of price by itself has been
considered insufficient to implicate the vendee in the fraud-
ulent intent or to impeach his good faith, and inadequacy
of consideration, unless extremely gross, does not *per se*
prove fraud.    It must appear that the price was so mani-
festly inadequate as to shock the moral sense and create in
the mind at once, upon its being mentioned, a suspicion
of fraud."

Applying this rule to the case at bar, we think that the
court erred in finding that the value of the stock of goods
was $10,000, or that the price paid was a grossly inade-
quate consideration for said stock, so as to put a pur-
chaser upon inquiry as to the intent of the seller.    We
think the judgment of the court in decreeing an accounting
from Keck was erroneous.

The recovery against the defendant Braden is based on
subdivision "b," § 60, of the national bankrupt act, which
provides as follows:

"If a bankrupt shall have given a preference within
four months before the filing of a petition, or after the
filing of the petition and before the adjudication, and the
person receiving it, or to be benefited thereby, or his agent
acting therein, shall have had reasonable cause to believe
that it was intended thereby to give a preference, it shall
be voidable by the trustee, and he may recover the prop-
erty or its value from such person."

While the findings of the court bring the case within the
above provision of the statute, we look to the record in
vain to find any evidence to support the findings in this
regard.    There is nothing more than a mere suspicion.

The only testimony having any bearing upon this question is the following questions asked the witness Thomas:

"Q. Did you inform Mr. Braden? [As to his financial condition at the time of the sale to Keck.] A. No, sir. Q. Do you know whether or not Mr. Keck or Mr. Braden knew your financial condition at that time? A. No, sir; I don't know that, though I suppose not."

Also the following questions asked the witness Braden:

"Q. Now, Mr. Braden, when you accepted this note you, of course, knew that Thomas was indebted for other goods, did you not? A. Not to my knowledge; no, sir. Q. And you knew he was buying largely of wholesalers, did you not? A. I knew he was buying goods. Q. You knew he was not paying cash for them, did you not? A. No, sir. Q. At the time this note was received by you, did you not know that Thomas was indebted to wholesale merchants? A. No, sir."

This is all the direct testimony contained in the record bearing in any way upon the knowledge of the defendant Braden as to the insolvency of Thomas, or as to his intent in receiving the promissory note in question. There is nothing to overcome this direct testimony. True, he was in the employ of Thomas as clerk or salesman for some four years; but he was not the bookkeeper, nor does it appear that he had access to the books. Conceding that he had, the books are in evidence, and, so far as they show, they bear no internal evidence that Thomas was insolvent. There was nothing in the conduct of the business to cause any person familiar therewith to believe, or even to suspect, that Thomas was insolvent, while, on the other hand, there was every reason to believe he was solvent and prosperous. His cash sales for about eleven months preceding his sale to Keck, excluding the holiday season, amounted to $17,514.15, and his losses, conceding his sales on credit

to be total losses, were next to nothing. His purchases during the year amounted to only $15,515.31, so that he could have paid cash for all his goods, and have a balance of $2,000 to defray his other expenses, and his stock in better condition than when he started in the new year. Surely, it cannot be said that a merchant carrying a stock of about $10,000, and making sales to the amount of $18,-000 or $20,000 a year at an average profit of 20 per cent., and suffering no losses, is in failing circumstances. Everything in the record tends to corroborate the testimony of the witnesses Thomas and Braden when they state that the latter had no knowledge of the insolvency of the former, and there is not a single circumstance to discredit either of them, further than that the bill of sale was executed in the evening, after the close of business, in the office of Thomas' attorney, and the sum of $3,500 was paid in cash in place of by check. This of itself is not sufficient to establish fraud. Braden's position as clerk or salesman did not charge him with notice of the credit extended to Thomas. If any authority were needed in support of so plain a proposition, the decision of the supreme court of Nebraska in the case of *Jones v. Douglas,* 52 Neb. 151 (71 N. W. 976),—a case where the clerk purchased directly from his employer,—is in point. Says the court:

"It is contended that his occupation as a clerk in the store apprised him of the existence of such indebtedness; but we cannot hold that any such confidential relation exists between a proprietor of a mercantile establishment and his clerks or salesmen that the latter are charged, as a matter of law, with notice that goods purchased have not been paid for."

The disposition by Thomas of the $3,500 paid by Keck in purchasing a homestead in no way tended to prove that Keck was aware of Thomas' insolvency, or of his fraudu-

lent purpose in disposing of the stock. We have taken into consideration in coming to the conclusion we have, that there is in existence a custom among retail merchants to receive credit from wholesale merchants, and we have also considered the evidence as showing that Keck received cash in payment in place of a check, and that ordinarily amounts as large as the sum paid here for the stock of goods are paid by check on a bank of deposit. This disposes of the seventh assigned error on the part of appellant Dunlop, relative to the rejection of evidence.

We also think that the judgment of the court against Braden is erroneous.

The judgment of the court below is reversed, and this cause is remanded, with instructions to the court to dismiss the action at the cost of the appellant Dunlop; the appellants Keck and Braden to recover their costs on this appeal.

REAVIS, C. J., and DUNBAR, HADLEY, ANDERS, MOUNT and FULLERTON, JJ., concur.