[No. 14991. Department One. November 27, 1918.]

## C. M. WILLIAMS, *as Trustee in Bankruptcy of Knosher's Incorporated, Appellant,* v. MRS. S. L. DAVIDSON, *Respondent.*[1]

BANKRUPTCY (5-8)—PREFERENCE—REASONABLE CAUSE FOR BELIEF. A creditor taking over a bankrupt's stock in good faith, after diligent inquiry as to the total indebtedness of the insolvent, and agreeing to pay all debts in full, is not liable to the trustee for receiving a preference, under subd. b of § 60 of the bankruptcy act, which requires that such person have reasonable cause to believe that he was receiving a preference.

CORPORATIONS (207, 208)—INSOLVENCY—PREFERENCE—TRUST FUND DOCTRINE. Under the trust fund doctrine, a creditor of an insolvent corporation who in good faith purchases all the assets, assuming all debts under misrepresentations, is liable to the trustee in bankruptcy although not liable under the bankruptcy act; and is not protected by compliance with the sales in bulk statutes, Rem. Code, § 5296.

SAME—EXTENT OF LIABILITY. In such case, the liability on securing the preference is limited to the *pro rata* share which excluded creditors would have been entitled to upon a ratable distribution of the assets.

CHADWICK, C. J., and FULLERTON, J., dissent.

Appeal from a judgment of the superior court for King county, Allen, J., entered August 8, 1918, upon findings in favor of the defendant, dismissing on the merits an action to set aside a fraudulent transfer of corporate assets, tried to the court. Reversed.

[1]Reported in 176 Pac. 334.

*Bausman & Oldham* and *Donald G. Eggerman,* for appellant.

*Hartman & Hartman,* for respondent.

Tolman, J.—This action was brought by the appellant, as trustee in bankruptcy of Knosher's Incorporated, a bankrupt corporation, to cancel and set aside a transfer of the corporate assets theretofore made to the respondent, upon the ground that the transfer was preferential and void and was made to the respondent, the principal corporate creditor, with intent to hinder, delay and defraud the other creditors of the corporation. The complaint charged that the transfer was made by the corporation within four months preceding its adjudication as a bankrupt, and at a time when it was wholly insolvent; that the respondent knew, at the time of the transfer, of such insolvency, and that the transfer effected a total depletion of the corporate assets, leaving the other corporate creditors wholly unpaid. The relief sought was cancellation, the appointment of a receiver, and the recovery from respondent of the assets which she received, or their value. The respondent, answering, admitted the transfer, but as an affirmative defense, alleged that she purchased the assets from the corporation in good faith in compliance with the sales in bulk law, that she assumed and paid corporate debts to the amount of $15,076.35, which the corporation had represented to her was its total indebtedness, and that therefore she had acquired the assets for a valuable consideration, in good faith. The affirmative matter in the answer was denied. Upon a trial below there was but little serious conflict in the evidence, and, briefly stated, the facts which appear to be established are as follows:

Knosher's Incorporated was a domestic corporation, operating a retail store in the city of Seattle,

with a capital stock of $15,000. Respondent's deceased husband, S. R. Davidson, had been a creditor of this corporation, his debt being evidenced by a demand note, upon which there was due on October 2, 1917, $8,022.25. This note was secured by a chattel mortgage upon the stock and fixtures of the corporation, which had never been filed for record. Prior to Mr. Davidson's death, which occurred in August, 1917, he had made repeated demands for payment of this debt, and had sent an auditor to the debtor's store to check up its affairs, and placed an agent in charge of the store and business. The respondent is the executor of the nonintervention will of her deceased husband, acting without bond, and is his sole beneficiary under the will. Upon the probate of the will, the respondent, with the assistance of her attorney, vigorously renewed efforts to enforce collection of her claim against Knosher's Incorporated, and her attorney, by threats of a receivership and representations that it was practically bankrupt, succeeded in placing respondent's agent in full and exclusive charge and control of the receipts and disbursements of the corporation's business, and the agent so remained in control until the property was transferred by a bill of sale to the respondent on October 2, 1917. During all of this time, the corporation was heavily indebted, the greater portion of its indebtedness being past due, and it was unable to pay, and apparently was in a failing condition. The respondent and one MacMaster, to whom it owed $1,800, were its most pressing creditors. As its credit standing was poor, it was unable to purchase new goods, and its stock had run down. The assets consisted of the stock of goods and fixtures, which, according to an inventory taken by the respondent, amounted in value to the sum of $15,053.70.

Shortly before the time of the transfer, it developed that a list of creditors furnished to the respondent by the corporation was incomplete, the debt to MacMaster having been omitted therefrom. MacMaster, finding that the respondent was in full possession of the corporate assets, and that no provision had been made for his claim to share in the proceeds of sales, employed an attorney, who threatened to place the corporation in the hands of a receiver, or take other drastic measures, unless his client was permitted to share in the proceeds. Negotiations ensued between Mac-Master and respondent, which resulted in an agreement by respondent to purchase the MacMaster claim for $1,200 and take an assignment of it to herself. Upon the appearance of the MacMaster claim, respondent demanded that the corporation transfer all of its property to her, and suggested as the only alternative an involuntary liquidation. The corporation, through its officers, acquiesced in this demand, and a bill of sale was drawn and an affidavit under the sales in bulk law was prepared, which was signed and verified by the president of the corporation. The list of creditors verified by this affidavit showed an indebtedness aggregating $15,076.35, including the respondent's claim for $8,022.25, the MacMaster claim for $1,800, which respondent paid or purchased at the time of receiving the bill of sale and affidavit, by paying therefor $1,200 of her own money, and another note of the corporation for $1,274.84, upon which the respondent was personally liable as a guarantor.

It is conceded that five claims against the corporation, amounting to $4,538.23, were not included in this list of creditors made by the corporation and verified by its president, and that these claims have not been paid. It is established, however, by the evidence that

the respondent took special pains to have the books of the corporation examined, its officers closely questioned, and every inquiry made which good faith required, without discovering the omission of these claims from the affidavit, or any fact which would put her on notice of such claims, or any of them. None of the excluded creditors were advised of, or had any notice of, the transfer of the corporate assets to the respondent until after it had taken place. One of these creditors wrote the respondent's attorney about the middle of October, 1917, and then learned what had taken place, and on or about November 7, 1917, respondent was fully advised of the existence of all of the corporate indebtedness which had been excluded from the affidavit under the sales in bulk law. Immediately upon the transfer being made, respondent advanced from her personal funds, in addition to the $1,200 used to purchase the MacMaster claim, about $700, which was paid upon the pressing debts shown in the affidavit, and these sums are practically all that the respondent advanced at any time in this transaction. The remainder of the corporate debts covered by the sales in bulk affidavit, including her own, have been paid out of the proceeds of the business, which respondent operated after the transfer, buying new stock, commingling new goods with old, and operating the business generally as her own.

On December 8, 1917, and within four months after the transfer, a petition in bankruptcy was filed against Knosher's Incorporated, which charged the transfer referred to as an act of bankruptcy, and on January 2, 1918, the corporation was adjudged a bankrupt, and appellant herein was duly appointed trustee, and having qualified, was authorized by the bankruptcy court to institute this action. The trial court made findings of fact, conclusions of law, and rendered judgment dis-

missing the action, from which this appeal is prosecuted.

It seems manifest that the appellant has no right of action against the respondent under subdivision b of §60 of the bankruptcy law, because it is there provided that, before recovery can be had, it must appear that the person receiving a preference or to be benefited thereby must have had reasonable cause to believe, not only that the bankrupt was insolvent, but that he was receiving a preference. And in this case the respondent, having made diligent inquiry and ascertained, as she believed, the total indebtedness of the insolvent corporation, and assumed and bound herself to pay it all in full, could not, under that state of facts, have received a preference. Hence the trial court did not err in holding that there was no cause of action under the bankruptcy law.

However, appellant's right of recovery is not limited to the bankruptcy law, but if the transfer is preferential and void under the law of this state, he is entitled to recover. The trust fund doctrine as applied to insolvent corporations was announced by this court in *Thompson v. Huron Lumber Co.*, 4 Wash. 600, 30 Pac. 741, 31 Pac. 25, was exhaustively discussed, considered and reaffirmed in *Conover v. Hull*, 10 Wash. 673, 39 Pac. 166, 45 Am. St. 810, and has been followed in an unbroken line of decisions ever since that time. So that if anything may be said to be settled, this doctrine has become the settled law of this state, and we cannot depart from it. The trust fund doctrine from first to last is to the effect that the property and assets of an insolvent corporation constitute a trust fund in the hands of the managers of the corporation for the benefit of each and all of its creditors ratably, and although a private debtor may prefer creditors, even to the exhaustion of all his assets, an insolvent cor-

poration will not be permitted to do or suffer anything which will permit one or more creditors to obtain a preference, no matter what the good faith of such creditor may be.

But it is contended that the trust fund doctrine, after all, is in all respects subject to the equitable principles covering trusts in general, and that third parties will be protected in their dealings with the trustee, even if he has violated his duty, and that a stranger who has purchased from the trustee without notice of adverse claims will receive good title. In this case, however, the respondent had ample notice of the insolvency of the corporation; and though, after the exercise of due diligence, she did not know of the existence of the excluded creditors, yet that cannot give her equities superior to theirs, because they were likewise in ignorance of the plan to take over the assets, and having the right to rely upon the settled law of this state, had no reason to inquire if such a course of action was in contemplation. Respondent's acts, done in reliance upon the representations of the corporate officers that there were no other creditors, though done in good faith on her part, were in effect a legal fraud upon the rights of the excluded creditors, and made that fraud possible. So that, under the familiar rule of equity that, as between two innocent persons, the one whose act caused the loss and made the fraud possible must suffer the consequences, respondent must suffer here, and cannot be heard to claim that her equities are superior to those of the excluded creditors.

"This court, since the case of *Thompson v. Huron Lumber Co.*, 4 Wash. 600, 30 Pac. 741, 31 Pac. 25, has adhered to the doctrine that, although a private debtor

may prefer creditors even to the exhaustion of his property, this will not do in the case of an insolvent corporation, *no matter what the good faith of its creditor is."* Jones v. Hoquiam Lumber & Shingle Co., 98 Wash. 172, 167 Pac. 117.

Respondent further contends that she is protected by the sales in bulk law, and cites *Friend v. Rosenfeld-Rovig Co.*, 87 Wash. 329, 151 Pac. 776. This case is not applicable because the debtor therein was an individual, and the trust fund doctrine in nowise applied. Nor can the statute, Rem. Code, § 5296, apply, because the corporation was admittedly insolvent, was known to the respondent to be insolvent, and an insolvent corporation, in view of the trust fund doctrine, may not, by calling a transfer a sale, enable a creditor who, like respondent, is moved primarily by the desire to collect his demand, to secure a preference over other corporate creditors. To hold otherwise would be to permit dishonest corporate officials to wholly nullify the trust fund doctrine.

It follows that the judgment appealed from must be reversed, but not necessarily that the court below be directed, as contended for by the appellant, to enter a judgment for the value of the corporate assets received by respondent. This being an equitable proceeding, and respondent having acted in good faith throughout in reliance upon the affidavit and representations of the president of the debtor corporation, she is entitled to be protected against loss so far as possible without diminution of the rights of the excluded creditors. It appears in the record without dispute that the claims paid by and through the transfer to respondent amounted to $15,076.35; that the excluded claims, which constituted the remainder of the corporate indebtedness, amounted to $4,538.23, and that, therefore, the total indebtedness of Knosher's Incor-

porated was $19,614.58. The total assets at the time of the transfer, as shown by the inventory, were $15,053.70, which, if ratably distributed to all the corporate creditors, would have paid a dividend of a trifle less than seventy-seven per cent. Fixing the ratio then at seventy-seven per cent, in lieu of allowing interest on the excluded claims, the equitable rights of the excluded creditors will be fully satisfied by the entry of a judgment in favor of the appellant, as trustee, and against the respondent for the sum of $3,494.43, together with costs.

The case is reversed, and remanded with directions to enter a judgment accordingly.

MAIN, C. J., MACKINTOSH, CHADWICK, and MITCHELL, JJ., concur.

## ON REHEARING.

[*En Banc.* May 31, 1919.]

PER CURIAM.—Upon a rehearing *En Banc* a majority of the court still adhere to the opinion heretofore filed herein, and for the reasons there stated, the judgment is reversed.

CHADWICK, C. J. (dissenting) — Upon a rehearing *En Banc* a majority of the judges incline to our former opinion. I concurred in that opinion, but I am now convinced that the court fell into error. While there is nothing that I can say that will change the result, I feel it to be my duty to explain why I think we were wrong in the beginning and why it is wrong to adhere to our opinion.

I am willing to subscribe to the trust fund doctrine, which this court has affirmed without material qualification, and vigorously, since *Thompson v. Huron Lumber Co.*, 4 Wash. 600, 30 Pac. 741, 31 Pac. 25; but the trust fund theory is not substantive law *ex propria*

*vigore*—it is a rule of equity arising, first, in the conscience of the chancellors and finally recognized generally as a rule binding on all who deal with corporate assets.    The power of the legislature to limit, qualify or negative any rule of decision cannot be questioned. The legislature has functioned upon the precise subject-matter of this controversy.    The sales in bulk law (Rem. Code, § 5296 *et seq.*) has, to the extent that it is applicable, modified the trust fund theory as applied to the sale of corporate assets, if those assets be a *"stock of goods, wares or merchandise."*    By that act, the right of an individual or a corporation to sell a stock of goods is recognized.    The legislature must have had in mind the hardship that had come all too often to innocent buyers of stocks of goods, as our reports will show.    That the innocent buyer might have protection and the sale and transfer of goods might go on as a favored relation under the law, as it has ever been, it is provided:

"It shall be the duty of every person who shall bargain for or purchase any stock of goods, wares or merchandise, in bulk, for cash or on credit, before paying to the vendor, or his agent, or representative, or delivering to the vendor, or his agent, any part of the purchase price thereof, or any promissory note or other evidence therefor, to demand of and receive from such vendor, or agent, *or if the vendor or agent be a corporation, then from the president, vice-president, secretary, or managing agent of such corporation,* a written statement, sworn to substantially as hereinafter provided, of the names and addresses of all the creditors of said vendor, to whom said vendor may be indebted, together with the amount of the indebtedness due and owing, and to become due and owing, by said vendor to each of said creditors; and it shall be the duty of said vendor, or agent, to furnish such statement, which shall be verified by an oath to the following effect:"    Rem. Code, § 5296.

Now, if the rule of the majority obtains, the words "or if the vendor or agent be a corporation, then from the president, vice-president, secretary, treasurer or managing agent of such corporation" are without meaning and lumber the statute without having a place therein; for it would follow that, whatever the good faith of the purchaser of a stock of goods may be, however careful he may have been to protect himself under the law, however literally he may have followed the terms of the statute, the affidavit which the statute says may be made by the president, vice president, secretary, treasurer or managing agent of such corporation, if the vendor be a corporation, will not protect him if the corporation has other debts than those scheduled by the agent of the corporation.

What means the language, "It shall be the duty" of one who buys a stock of goods to *do* certain things? Unless we abandon all rules of construction it means that, if the legal duty imposed as a condition precedent to a sale in bulk is performed, title will pass to the innocent purchaser. The innocence and good faith of respondent are not impeached. She is drawn into a pit of our own making, after she has done all that the written law of this state says that she should have done.

If it were not for the trust fund theory, which does not obtain in all of the states, but which we confess to be the rule here, a sale by an insolvent corporation would be good if made to an innocent purchaser without notice. It is only because the courts have said the assets of a corporation are a trust fund for all creditors that it is so, not because of any statute; therefore, it would seem to follow that when the legislature, having notice of our holdings, passes a law which says that a purchaser who complies with its terms, whether the

sale be made by a corporation or by an individual, is good, I cannot understand why it should not be so.

The act is drawn for the announced purpose of protecting a vendee, and it provides the manner of that protection. It is drawn with a like intent to compel a truthful deliverance on the part of the seller. It fixes a penalty for the false swearer. It makes him guilty of perjury and provides for imprisonment in the penitentiary or a fine not exceeding the sum of one thousand dollars.

In the instant case, the respondent was a heavy creditor of the corporation. To save herself she agreed to buy the stock and to pay the debts which had been listed for her benefit. She was willing to pay that price for the stock, and we are not in a position to assume that she would have paid more. She took every precaution that the law demanded, and is now compelled to pay that which she would not have paid if she had known of other debts.

It may be said that, because respondent was a creditor, she cannot claim the protection of the statute. My answer to this is that the statute makes no such exceptions. It applies to all who act in good faith.

It seems to me that the statute settles the case; but if the statute permitted of any doubt or required any construction, all question is foreclosed. This case falls squarely upon the foundation, and fits completely the superstructure, of *Friend v. Rosenfeld-Rovig Co.*, 87 Wash. 329, 151 Pac. 776.

"As we understand the argument of the appellant, it is not claimed that there was any actual fraud in the transfer from Leo Lynch to the respondent. But it is argued that the transfer was a fraud in law because one of the creditors was omitted from the affidavit. Upon the trial, Leo Lynch testified that he had previously informed the respondent Rosenfeld-Rovig Com-

pany that he owed his sister some money, but at the time he made the affidavit stating the names of his creditors, he made no such statement. The persons present at the time the affidavit was made testified that he made no statement to the effect that he owed his sister anything. The trial court found that, at the time of the transfer, the respondent had no notice or knowledge that there was any debt owing by Leo Lynch to his sister; that the first notice the respondents had of this fact was after they had taken possession of the stock of goods and were negotiating for the sale thereof, when Miss Lynch stated that she was a creditor of her brother. She permitted the property to be sold and the debts to be paid before any action was taken by her to avoid the sale.''

It may be said of that case that the vendee had no notice that the party was insolvent, and it may be contended that the respondent knew that her vendor was insolvent, but that is not controlling, for the sales in bulk law was enacted for the protection of those who buy of insolvent vendors, as well as solvent vendors. If all purchases were made from solvent firms there would be no reason for the enactment. But knowledge of insolvency would not deny respondent her legal right, for another reason. She was buying under a contract which bound her to pay all the disclosed liabilities of the vendor.

I have extended my views merely for the purpose of writing it into the books as one of the last acts of my judicial career that I was wrong. I believe that respondent has been undone of her rights, and, while it affords poor consolation, I can do no more in the way of correcting my error than to confess my fault.

FULLERTON, J. (dissenting)—For the reasons stated by Judge Chadwick, I think the majority err in the conclusions reached in this case. I therefore dissent from the judgment directed.