Charles **ARNOLD** and **Chicken-Eggs, Inc.**, Appellants,

v.

Cleo P. **KING**, Trustee in Bankruptcy of James C. Bookey, Sr., Bankrupt, Appellee.

No. 14944.

United States Court of Appeals Ninth Circuit.

Aug. 27, 1956.

Guy E. Dunning, William A. Bowles, Seattle, Wash., for appellants.

James H. Madison, Wallace Aiken, Howe, Davis, Riese & Aiken, Seattle, Wash., for appellee.

Before HEALY, LEMMON and FEE, Circuit Judges.

LEMMON, Circuit Judge.

Even in America, the Horatio Alger catapulting of trucker to tycoon is open to suspicion—especially when Horatio Alger heads an organization apparently used as a dummy to conceal a bankrupt's assets.

And when we find a violation of the Bulk Sales Act, RCW 63.08.010 et seq., and an attempt to assert a colorable adverse claim in order to divest the Referee of summary jurisdiction, suspicion becomes almost a certainty.

## 1. Statement of the Case.

This is a companion appeal to Bookey v. King, No. 14943, 9 Cir., 236 F.2d 871. Much of the Statement of the Case set forth in our opinion in No. 14943 is pertinent to the present appeal, and will not be repeated here. Only the relevant proceedings not recited in the earlier opinion will be stated.

For some years prior to January 1, 1954, James C. Bookey, Sr., and his son, James C. Bookey, Jr., hereinafter "Senior" and "Junior", respectively, as copartners had been operating a business of buying, processing and selling eggs at 17000 Aurora Avenue, in Seattle, Washington, under the firm name of J. C. Bookey Supply, hereinafter "Supply".

The building belonged to Senior, and at the time the petition in involuntary bankruptcy was filed, the rooms in which the business had been carried on were under lease to Samuel H. Plumer, Junior's father-in-law.

Supply had been buying eggs and processing them, selling them to stores, restaurants, bakeries, and the like, and to the United States Army.

On April 2, 1954, C. A. Swanson & Sons, a Nebraska corporation, a creditor of Supply, filed a complaint in the Superior Court at Seattle against Senior, Junior, and their wives, doing business as Supply, praying judgment on account of merchandise delivered, in the sum of $60,958.18, plus interest, and at the same time garnisheed the bank account of Junior and Supply, and accounts receivable of Supply, which had previously been assigned to the bank, and attached all the real property of the Bookeys. On the same day, the real property was levied upon by the sheriff and attached by him, and return was filed in the case on April 7, 1954. That property is still held by the sheriff under writ of attachment, the action being still pending at the time the briefs herein were filed.

The appellee was appointed Trustee of the bankrupt estate, and on August 10, 1954, he petitioned the court below for an order requiring the appellant Chicken-Eggs, Inc., hereafter Eggs, to turn over to him certain specified equipment.

At the same time, the Trustee petitioned the court for an order requiring the appellant Charles Arnold, hereafter Arnold, and Eggs to turn over to him an automobile and certain trucks.

The appellants appeared specially only, were overruled by the Referee, and then answered to the merits, without waiving their special appearance.

The Trustee had filed petitions for four turnover orders, but two of them were denied. The two that were granted are involved in the present appeal. All four petitions involved related facts and similar respondents, so that the hearings were consolidated and evidence relating to each was heard at the same hearings.

On October 18, 1954, the Referee handed down a "Memorandum Decision."

On October 26, 1954, the Referee made an order directing the appellants to turn over the following property to the Trustee:

1. All office and plant equipment and fixtures in their possession.

2. All inventory and stock in trade.

3. All trucks and automobiles.

4. All cash, bank accounts, and other moneys of the appellant Eggs.

5. All accounts receivable of Eggs.

6. All books of account and other records of Eggs.

7. "Possession of the property wherein the [appellant Eggs] is holding forth."

8. All other assets of every kind whatsoever of Eggs.

On the same day, the Referee handed down his Findings of Fact and Conclusions of Law.

On November 4, 1954, the appellants filed with the Referee their petition for a "full review" of the Referee's turnover order, by the District Judge.

On July 22, 1955, the District Judge filed a "Memorandum Decision", and on July 28, 1955, an "Order of Affirmance", sustaining the Referee's turnover order.

From that affirmance, the present appeal has been taken.

2. The Referee Had Summary Jurisdiction of the Proceeding.

The appellants assert that it "truly appears" from the petitions filed by the Trustee "that they are plenary suits against third parties to recover property adversely held by them and without their consent."

We do not agree. As will be seen hereinafter from our discussion of the evidence, the appellants' adverse claims are not real or substantial, but merely colorable.

When that is the case, a summary proceeding before the Referee is proper. In Harrison v. Chamberlin, 1926, 271 U.S. 191, 193–194, 46 S.Ct. 467, 468, 70 L.Ed. 897, heavily relied upon by the appellants, the Court said:

"It is well settled that a court of bankruptcy is without jurisdiction to adjudicate in a summary proceeding a controversy in reference to property held adversely to the bankrupt estate, without the consent of the adverse claimant; but resort must be had by the trustee to a plenary suit. [Many cases cited.] *However, the court is not ousted of its jurisdiction by the mere assertion of an adverse claim; but, having the power in the first instance to determine whether it has jurisdiction to proceed, the court may enter upon a preliminary inquiry to determine whether the adverse claim is real and substantial or merely colorable. And if found to be merely colorable the court may then proceed to adjudicate the merits summarily;* but if found to be real and substantial it must decline to determine the merits and dismiss the summary proceeding. [Cases cited.]" [Emphasis supplied.]

In May v. Henderson, 1925, 268 U.S. 111, 118–119, 45 S.Ct. 456, 460, 69 L.Ed. 870, the following language was used:

"The findings of the referee and the evidence leave no doubt that the surrender or abandonment of their bank account to the bank by the assignees and its attempted application by the bank to the payment of its note was collusive and without any substantial basis of legal right. At most it was a clumsy, ineffectual, and fraudulent effort to divert the funds of the bankrupt to the payment of a favored creditor. While it is now settled that the claim of an assignee for the benefit of creditors, of the right to charge in his account expenses incurred or expenditures made prior to the filing of the petition in bankruptcy, is an adverse claim which cannot be adjudicated in a summary proceeding [cases cited], we think the rule cannot be extended to a case such as this where the claim is merely colorable and on its face made in bad faith and without any legal justification."

In the instant case, the Referee's Memorandum Decision discloses that he was well aware of his responsibility to determine whether the appellants' claims were colorable, and he further discloses that he did make that determination:

"The Referee held that it was the Court's right and duty to have a hearing and determine whether or not such claim as the respondents had was only colorable and if it was found that the claim was not substantial, but was only colorable, then the Court had jurisdiction to hear all of the pertinent evidence and to enter a Turn-Over Order.

\* \* \* \* \* \*

"The failure to comply with the Bulk Sales Act made this transaction fraudulent and void and the uncorroborated story as told by [Plumer and Junior] was so improbable and fraudulent on its face that the action of this Court in taking summary jurisdiction is amply supported by the following authorities: [Citing cases] \* \* \*."

3. The Referee's Findings, Particularly When They Are Affirmed by the District Judge, Must Be Accepted "Unless Clearly Erroneous".

In his Memorandum Decision, the District Judge said that he was "convinced that respondents' adverse claims are not real or substantial but merely colorable; and, further, that there is substantial evidence to sustain each of the contested findings of the referee * * *.

"The court, having concluded after careful scrutiny that the Referee's findings are not erroneous, they will be affirmed. Having affirmed the findings of facts, the conclusions of law as made by the Referee as well as the turnover order are likewise affirmed."

General Order 47, 11 U.S.C.A. following section 53, of the General Orders in Bankruptcy reads as follows:

"Unless otherwise directed in the order of reference the report of a referee or of a special master shall set forth his findings of fact and conclusions of law, and *the judge shall accept his findings of fact unless clearly erroneous.* The judge after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions." [Emphasis supplied.]

■ But even before the promulgation of General Order 47, it was well settled that in cases where the referee and the District Court concur in their findings of fact, their conclusions will not be disturbed unless they are clearly against the weight of the evidence or unless plain error appears.

In Monson v. Hibler, 9 Cir., 1928, 24 F.2d 909, 910, the late Senior Judge Gilbert said:

"The judgment of a District Court on the facts will not be disturbed on appeal unless it is clearly against the weight of the evidence, or unless plain and manifest error

exists; and this is especially true where *both the referee and the District Judge have coincided in their conclusions.* This court has so held in [citing many cases]." [Emphasis supplied.]

■ In their opening brief, the appellants advert to the fact that "all of the material testimony heard was the testimony of respondents—the appellants in this court." This fact, however, does not constrain the Referee, the District Judge, or this Court to believe the appellant's testimony.

In Heath v. Helmick, 9 Cir., 1949, 173 F.2d 157, 161–162, we used the following language:

"There is a suggestion that the referee was not justified in finding fraud. It is said that, whether the inference can be drawn from certain evidence is a question of law. *But the trier of fact, who sees the witnesses is free to disbelieve them even if there is no flat contradiction.* So here the referee, after he had before him the transfer of the property with the retention of possession in accordance with a secret agreement and a retransfer after discharge in bankruptcy, coupled with the withholding of the final deed from record, was compelled to make the inference of fraud as a matter of law. *In any event, this court would be constrained to support the findings of a referee who saw the witnesses, where these are fully supported by the record and are concurred in by the trial court on review.*" [Emphasis supplied.] [1]

4. The Transfer of Supply's Plant and Office Fixtures and Equipment to Eggs Was in Violation of the Bulk Sales Act of the State of Washington.

The appellants do not deny that they did not obtain the statements or make

1. See also Prentice v. Boteler, 9 Cir., 1944, 141 F.2d 175, 176; Beneficial Industrial Loan Co. v. Williams, 9 Cir., 1944, 145 F.2d 510; Yates v. Boteler, 9 Cir., 1947, 163 F.2d 953, 955, and cases cited; Procter & Gamble Mfg. Co. v. Metcalf, 9 Cir., 1949, 173 F.2d 207, 209; Losey v. Losey, 9 Cir., 1953, 204 F.2d 684, 685; Gold v. Gerson, 9 Cir., 1955, 225 F.2d 859, 860–861.

the filings required by the Bulk Sales Act of the State of Washington, infra. Indeed, the answer of Eggs specifically admits such non-compliance. They contend, however, that that statute is not applicable to the business conducted by Supply, because "This business did not consist of buying and selling merchandise as a regular course of business," but consisted "primarily of purchasing eggs from the producers and the operation of a factory wherein the said eggs were candled, graded, processed and re-assembled and packed into different containers *for the purpose of selling the same to prospective customers, and many eggs were specially prepared for bakeries.*" [Emphasis supplied.]

■ The foregoing statement is not only self-contradictory, since it shows that the ultimate "purpose" of Supply's activities was the "selling of eggs to prospective customers", but it is also in conflict with the second sentence of the "Statement of the Case" in the same brief, in which it is recited that the Bookeys "had been operating a business of buying, processing and *selling* eggs". [Emphasis supplied.]

Finally, the testimony of Plumer puts the nature of Supply's business beyond cavil:

"Q. And J. C. Bookey Supply had been engaged in the business of buying and *selling* and dealing in goods, towit, eggs? A. *Correct.*"

In their reply brief, however the appellants argue that "even if the Bulk Sales Act applied, appellants had a substantial claim to the property it [Eggs?] purchased from * * * Supply. In the first place it had possession prior to the time of the first petition in bankruptcy (this admitted by appellee), and had purchased it for value. In the second place, it had not purchased all of the equipment—and practically no stock of the Supply Company, the bulk of the equipment and stock having previously been disposed of by * * * Supply * * *. In the third place * * * Eggs * * * paid full value for every-

thing they purchased from the alleged bankrupt and, under the laws of the State of Washington, that is a complete defense to the Referee's [sic] cause of action".

In view of Eggs' formal and categorical admission of non-compliance with the Bulk Sales Act, this belated attempt, in their *reply* brief, to show that, even if the Act did apply to them, they didn't violate it anyway, does not conform to what we conceive to be a "fair opening" argument. Be that as it may, there is no merit, as we shall see, to this after-thought of the appellants.

The Bulk Sales Act of the State of Washington, as amended by §§ 1, 4 of Chapter 247 of the Laws of 1953, and as set forth in the Revised Code of the State, reads in part as follows:

"63.08.020

"Every person who bargains for or purchases all or substantially all of any stock of goods, wares, or merchandise, * * * or all or substantially all of the fixtures and equipment used in and about the business carried on by the vendor, in bulk, * * * shall, before paying the vendor * * * or delivering to the vendor * * * any of the purchase price thereof, or any promissory note or other evidence of indebtedness therefor, demand of and receive from the vendor * * * a statement in writing * * * giving the names and addresses of all persons to whom the vendor is indebted for or on account of services, commodities, goods, wares * * used in or about or furnished to the business of the vendor * * *."

"63.08.050

"Whenever a person bargains for or purchases all or substantially all of a stock of goods, wares, or merchandise, * * * or all or substantially all of the fixtures and equipment used in and about the business of the vendor, in bulk, for cash or credit, and pays any part of the purchase price, or executes, or

delivers to the vendor thereof, or to his order, or to any person for his use, a promissory note or other evidence of indebtedness for the purchase price, or any part thereof, without having demanded and received from the vendor or from his agent, the statement hereinbefore provided for * * * and without filing the statement in the office of the county auditor at least seven days before the consummation of the purchase, the sale or transfer shall be fraudulent and void as to creditors of the vendor, of the character to be included in the statement * * *."

In the first place, the appellants state that they had a substantial claim to the property it purchased from Supply, having possession prior to the time of the filing of the first petition in bankruptcy, and had purchased it for value. The appellants do not explain the relevancy of such "substantial claim" or possession prior to the filing of the petition, nor do they cite any law on the subject.

In the second place, the appellants contend that Eggs "had not purchased all of the equipment". The alleged sales contract between Supply and Eggs, Trustee's Exhibit No. 2, purports to cover the "sale of *all* plant and *all* office equipment of the J. C. Bookey Supply Co., 17000 Aurora".

In connection with these first two arguments, it should be pointed out that Plumer testified that Eggs purchased "substantially all" "the office fixtures and furniture and plant fixtures and equipment" of Supply "on April 1st or March 31st".

Finally, the appellants maintain that Eggs "paid full value for everything they purchased from the alleged bankrupt and, under the laws of the State of Washington, that is a complete defense to the Referee's [sic] cause of action". In support of their contention, they cite five cases decided by the Supreme Court of the State of Washington: Dunlop v. Thomas, 1902, 28 Wash. 521, 68 P. 909; Williams v. Davidson, 1918, 104 Wash. 315, 176 P. 334, 181 P. 874; McNamara v. Farnsworth, 1919, 106 Wash. 523, 180 P. 466; Heaton v. Chitty, 1928, 146 Wash. 634, 264 P. 417; and Fisher v. Thumlert, 1938, 194 Wash. 70, 76 P.2d 1018.

We wonder why the appellants have cited these five cases. Most of them do not even mention the Bulk Sales Act. Williams v. Davidson, supra, refers to it *as not protecting* even the party that complied with it, whereas here the appellants have admitted non-compliance. In that case, the superior court had dismissed on the merits an action to set aside a fraudulent transfer of *corporate* assets. The Supreme Court of Washington reversed, holding that under the trust fund doctrine, a creditor of an insolvent corporation who in good faith purchases all the assets, assuming all debts under misrepresentations, is liable to the trustee in bankruptcy, although not liable under the bankruptcy act; and is *not protected* even by *compliance* with the sales in bulk statutes.

█ We hold that the Referee was correct in finding that "there was no compliance with the Bulk Sales Law * * * with regard to the purported transfer of plant and office fixtures and equipment and inventory" from Supply to Eggs. Accordingly, by the terms of that Act, "the sale or transfer" was "fraudulent and void as to creditors of the vendor"—and therefore void as to the Trustee in bankruptcy.

5. Eggs Was Organized for the Purpose of Concealing Supply's Assets and Is a Continuing Operation of Supply.

Junior testified that in March, 1954, he transferred a Chevrolet coupé and four trucks—five transfers in all—to Charles Arnold, a former "employee", "in settlement of the labor he had against us". Later, Arnold was *president* and *managing officer* of Eggs. Junior admitted that the Supply books of account showed no indebtedness to Arnold, nor was there any other written evidence; but Junior claimed that back in 1952, when he didn't have "the money

to pay him", he told Arnold: "Chuck, I can't take care of you now, because I haven't got it. We will keep track of it and when the day comes when I can take care of you, I will do it."

Arnold himself testified that he was "Not actually owed money" by Supply; that "there was nothing on the books" to show back wages due him, or "No written evidence" of any kind showing a claim against Supply; and that there was never any agreement on the part of Junior or Supply that they were going to pay him any "fixed sum" whatsoever. Arnold added this cryptic bit:

"He was going to pay me or make it good to me * * *. Well, if he was able to, yes."

Finally, in concluding his direct examination of Arnold, counsel for the appellee summarized his understanding of the witness's testimony as follows:

"Q. Didn't you tell me previously in answer to what he might pay you, he said it might be a lot or might be a little, depending on how much money he could get?"

And Arnold replied:

"A. Well, that is about right."

Arnold further testified that he and Plumer commenced operating Eggs about the end of March, 1954; that the trucks were used in that business, which was of the same type as Supply, was carried on in the same place, and with "practically all the same equipment". Arnold said that he "guessed" that Junior was working for him at that time. Junior himself testified that he was "working in the management department" of Eggs.

According to Arnold, immediately after he resigned from Eggs, he sold the trucks to Eggs. The latter paid him $642 in cash for the trucks, and in addition "took over all the bills that was against them". Eggs deducted these repair bills from "the agreed purchase price", Arnold explained. He agreed with appellee's counsel that they gave him "a pretty rough deal".

Plumer, who was secretary of Eggs, had previously testified that Arnold was charged $1847.84 for the "operation and maintenance on the trucks", including the rebuilding of two of them. Plumer further said that he "understood" that the trucks were given to Arnold "in settlement of a wage claim".

The following was Plumer's further version of the truck deal with Arnold:

Junior turned the trucks over to Arnold sometime during April, 1954. Arnold was to use the trucks "to help us operate Chicken-Eggs", according to an oral agreement. Eggs "certainly" used the trucks.

■ In view of the confused and contradictory testimony of Junior, Arnold, and Plumer regarding Operation Trucks, we hold that the label of "clearly erroneous" cannot be pinned upon the following finding of the Referee:

"That on or about July 12, 1954, Charles Arnold transferred legal title of the trucks given him by J. C. Bookey Supply, * * * to Chicken-Eggs, Inc.; that Chicken-Eggs, Inc., and all of its officers and directors had full knowledge that Charles Arnold gave no consideration to J. C. Bookey Supply for the said trucks and automobiles."

The evasions and contradictions of the appellants' witnesses are again illustrated in a section of Plumer's testimony, only incompletely quoted by appellants' counsel. We are italicizing the portion omitted by counsel:

"The Court. Now, April 1, 1954, you and Mr. Arnold as owners, and Mr. J. C. Bookey, Jr., as employee, took over the assets of J. C. Bookey Supply,—you took everything that was there, is that right?

"The Witness. No, —— • • ."

So the quotation that appears in the appellants' reply brief. But the brief's ellipsis dots indicate an important omission in the quotation:

"The Witness. No,—*we took, as far as the office and plant*— .

"*The Court: I mean what I say, you took everything that was there at that time.*

"*The Witness. What was left, yes.*"

In other words, Eggs made a clean sweep of Supply's remaining assets!

6. Conclusion

To multiply quotations from the record would merely lengthen this opinion unnecessarily. The testimony to which we have referred establishes, we think, that the Referee had summary jurisdiction of the proceeding; that the transfer of Supply's plant and office fixtures to Eggs violated the Bulk Sales Act of the State of Washington; and, finally, that Eggs was organized for the purpose of concealing Supply's assets, since Eggs is a continuing operation of Supply.

In any event, the state of the record does not warrant our saying that the Referee's findings, especially in view of the fact that they were affirmed by the District Judge, were "clearly erroneous".

And it is only when such findings are "clearly erroneous" that a Court of Appeals is authorized to set them aside.

Accordingly, the "Order of Affirmance" of the District Court must be and it is hereby

Affirmed.