[No. 22330. Department Two. June 2, 1930.]

ALVIN L. JENSEN, *Appellant,* v. AMERICAN BANK OF SPOKANE *et al., Respondents.*[1]

[1]Reported in 288 Pac. 660.

*Graves, Kizer & Graves,* for appellant.

*Lund & Dodds,* for respondent American Bank of Spokane.

*Alex M. Winston,* for respondents Lane *et al.*

FRENCH, J.—The appellant, as receiver of an insolvent corporation, commenced this action for the purpose of recovering from the respondent bank certain payments which it is claimed had been received from the insolvent corporation, or had been taken from the deposits of the insolvent corporation made with such bank, and which payments, it is claimed, constituted a preference under the trust fund doctrine as announced by this court in various cases which have been before us. The respondents Lane and Trenary, it is claimed, participated in enabling the bank to receive the funds in controversy, and it is also claimed that respondent Lane had himself received certain preferential payments. After appellant had introduced his testimony in the trial court, the sufficiency of the evidence was challenged, and the action was dismissed. This appeal follows.

The facts, as we gather them from the very voluminous record, do not seem to be seriously in dispute. The Trenary Service & Sales, Inc., was organized some time in the late summer or early fall of 1924. The principal stockholders of the company at the time of its organization were T. S. Lane and James F. Trenary. Mr. Trenary, for some years prior to the organization of the company, had been conducting a small automobile business, doing repair work and dealing somewhat in used cars. Mr. Lane was, at that time, the principal owner of a rather large automobile concern in the city of Spokane, and this latter concern had experienced some financial difficulties, and the matter had so worked around that Mr. Lane was able to take over and dispose of all of the assets of this concern. These assets were valued at approximately sixteen thousand dollars, and the most valuable part of the assets consisted of parts for Packard cars, and were turned in to the Trenary company.

Mr. Lane also purchased and paid cash for $3,400 worth of the stock of the Trenary company. The majority of the common stock, and it was the common stock that controlled the business affairs of the company, was owned by Mr. Trenary, and he was the president and active manager of all of the business affairs of the company. Mr. Lane seems to have acted as an officer of the company a few times during Mr. Trenary's absence, although not formally elected as an officer, and, generally speaking, we think the record shows that he had very little to do with the business affairs of the company, excepting that, from time to time, as occasion demanded, he was called upon to, and did, assist in a financial way.

Trenary is referred to in the record by a number of parties as a master salesman, and the history of the company seems to show sufficient justification for

so regarding him. The record indicates that, in the spring of 1925, the company was greatly handicapped by reason of the fact that they were unable to secure sufficient cars from the factory to come anywhere near filling their orders. The company had, in the meantime, secured the Packard agency for all of that vast territory surrounding Spokane, and had established local agencies in Wenatchee, Walla Walla, and other places. About April 1, 1925, the company transferred its banking business to the American Bank of Spokane, and for the period of a number of months thereafter sold substantially all of its conditional sales contracts to the respondent bank. Beginning in the late fall of 1925, however, the company began to sell certain conditional sales contracts to parties other than the bank.

In the middle of January, 1926, the company needed some immediate cash, and gave to Mr. Lane a note for seven thousand dollars, payable on demand, and at the same time, and as collateral security to guarantee the payment of this seven thousand dollar note, executed to Mr. Lane a written assignment of about eighteen thousand dollars worth of accounts receivable. Mr. Lane executed his personal note for seven thousand dollars to the bank, and pledged with that note, as collateral security, the note which the Trenary company had given him, together with the assignment of the accounts, and the bank advanced the seven thousand dollars. We think it is apparent from the testimony that this seven thousand dollars was advanced on Mr. Lane's personal credit. The bookkeeper of the Trenary company, at that time, was instructed that as fast as these accounts were paid in to deliver the money to the bank to be credited upon the note, and thereafter there was transferred to the

bank and credited on the note approximately three thousand dollars.

Beginning, generally, in the late fall or early winter of 1926, the respondent bank, which, as heretofore set out, purchased a large number of conditional sales contracts from the Trenary company, began to promptly charge back to the Trenary company's bank account all unpaid installments on the various contracts which the bank had purchased. These chargebacks were made pursuant to the agreement under which the company sold the conditional sales contracts, and the amount charged back within a short time prior to the date when the assignment was made to the Spokane Merchants' Association aggregates several thousand dollars.

It is the contention of the appellant "that respondents Lane and Trenary are responsible to the creditors of the company for their misconduct," and that the assignment of accounts receivable made to Mr. Lane as security at the time he advanced the seven thousand dollars was fraudulent, and that the amounts paid to the bank thereunder are recoverable, and, in support of this position, appellants cite *Benedict v. Ratner,* 268 U. S. 353.

This was a case where an advancement of fifteen thousand dollars had been made to a corporation, and security had been taken of "all accounts receivable then outstanding and all which should thereafter accrue in the ordinary course of business." The accounts were to be collected by the company, but, until required to do so, the company was under no obligation to apply any of the collections to the repayment of the loan. After stating the facts and setting forth the rule contended for by both parties, Mr. Justice Brandeis, speaking for the court, states:

"A title to an account good against creditors may be transferred without notice to the debtor or record of any kind. But it is not true that the rule stated above and invoked by the receiver is either based upon or delimited by the doctrine of ostensible ownership. It rests not upon seeming ownership because of possession retained, but upon lack of ownership because of dominion reserved."

And further on in the opinion:

"But it is only where the unrestricted dominion over the proceeds is reserved to the mortgagor that the mortgage is void. This dominion is the differentiating and deciding element."

Again, later in the opinion, the court states:

"In the case at bar, the arrangement for the unfettered use by the company of the proceeds of the accounts precluded the effective creation of a lien."

In the instant case, however, the testimony shows that instructions were given to the bookkeeper of the Trenary company that all collections should be immediately paid to the bank and credited on the Lane note. Both Lane and Trenary testified that, so far as they knew, this was done. Ultimately Mr. Lane lost about four thousand dollars on this transaction, and the assets of the company certainly were not diminished by it. Hoping for the best, Trenary was devoting his time to this company. Mr. Lane, on the other hand, gave practically no time to the affairs of the company, and was evidently not altogether familiar with its actual condition. He, from time to time, rendered financial aid and assistance. While it is true that it probably would have been better for all concerned had the company gone into receivership months earlier than it actually did, this conclusion is arrived at from what actually finally and ultimately happened. We can find nothing in the various trans-

actions of either Lane or Trenary which in any way depleted the assets of the insolvent company, or which could be said to in any way give to either of those two men a preference. We can find nothing in the record which would hold either man liable in any amount whatsoever under the trust fund doctrine, nor can we hold either man liable under any other theory suggested. As to Lane and Trenary, we think the judgment of the trial court was right.

A different question, however, is presented on behalf of respondent bank. It must be remembered that the bank had, during the year 1925, purchased many thousands of dollars worth of conditional sales contracts from the Trenary company. The arrangement between the Trenary company and the bank seems to have been that the bank was to have the first choice of any contracts discounted, and the company was required to make the following guaranty on all conditional sales contracts discounted:

"For value received we do hereby transfer, assign and set over all of its right, title and interest in and to the within contract and in and to the property therein described and to all of the moneys payable thereunder to the American Bank of Spokane, and hereby is guaranteed the payment of all moneys due or to become due under said contract, and also full performance by the second party therein named of all of the second party's promises and covenants and does hereby consent that the time of payment of any of said installments therein provided may be extended at the request of second party, notice of which is hereby waived."

From the record as presented to us, it being remembered that we have only appellant's evidence, an amount aggregating several thousand dollars was taken by the bank from the account of the Trenary company and credited on delinquent contracts which the bank held. As between the bank and the Trenary

company, this was undoubtedly the bank's right under the guaranty agreement; but, from the record which is here presented, we think no other conclusion can be reached than that this company was actually insolvent for some considerable time prior to the date when the actual assignment was made in the latter part of April, 1926, and the action waged by the receiver primarily rests on the alleged insolvency at the time when these payments were made to the bank, or at the time when these charge-backs were made by the bank. Regardless of what the rule may be in other jurisdictions, it has been well stated by this court in the case' of *Woods v. Metropolitan National Bank,* 126 Wash. 346, 218 Pac. 266, where we said:

"The principle on which the receiver based his action would seem to be well founded in law. Ever since the case of *Thompson v. Huron Lumber Co.,* 4 Wash. 600, 30 Pac. 741, 31 Pac. 25, this court has adhered to the doctrine that an insolvent corporation may not prefer its creditors; that, although an individual creditor may do so, even to the exhaustion of his property, the right does not exist in a corporation; that its property on insolvency becomes a trust fund for the benefit of all of its creditors to be equally and ratably distributed among them. *Conover v. Hull,* 10 Wash. 673, 39 Pac. 166, 45 Am. St. 810; *Benner v. Scandinavian American Bank,* 73 Wash. 488, 131 Pac. 1149, Ann. Cas. 1914D 702; *Jones v. Hoquiam Lumber & Shingle Co.,* 98 Wash. 172, 167 Pac. 117; *Simpson v. Western Hardware & Metal Co.,* 97 Wash. 626, 167 Pac. 113; *Williams v. Davidson,* 104 Wash. 315, 176 Pac. 334.

"The foregoing citations announce the further rule, also, that, in an action or suit on the part of the receiver to recover as for an unlawful preference, it is not necessary that he show that the creditor, at the time of receiving the preference, had knowledge or reasonable cause to believe that the corporation was insolvent. See particularly, *Jones v. Hoquiam Lum-*

*ber & Shingle Co., supra; Williams v. Davidson, supra."*

Reaffirmed by the court *En Banc,* 133 Wash. 700, 234 Pac. 672.

The record thus far introduced seems to indicate clearly that, particularly in view of the acts immediately prior to the assignment being given, several thousand dollars of such charge-backs were made. It is claimed, however, that the Trenary company, by making these payments, became subrogated to the rights of the bank, and had a claim against the purchaser therefor, and that therefore there was a substitution of new security of equal value, and that it does not offend against the trust fund doctrine in this state. We are not impressed with the argument that the obtaining of a claim against a defaulting car purchaser is, or can be said to be, a good substitute for cash.

Neither do we think that the doctrine of subrogation applies. These contracts were all installment contracts. These payments charged were, as we check the record, only installments due. No place was the face of the contract charged to the Trenary company, thereby making the Trenary company the owner of the contract. By paying the installment due on the contract, the Trenary company undoubtedly became entitled to collect, if possible, from the purchaser of the car the amount of such payment, and would probably have a claim against the car sold for the amount of such payment, but such claim must be in any event inferior to the rights of the bank which held the security. Payment of part of a debt, or payment of installments do not, generally speaking, entitle one making the payment to subrogation.

"There can be no subrogation to the rights of another unless the claim of that other is fully satisfied;

and, until the whole debt is paid there can be no interference with the creditor's rights or securities which might, even by bare possibility, prejudice him in the collection of the residue of his claim, for a right of subrogation is rather against the debtor than against the creditor, and subrogation will be denied one who did not pay or furnish the means to pay the entire debt.'' 37 Cyc. 379.

''The general rule is that a person is not entitled to be subrogated to a creditor's securities until the claim of the creditor against the debtor to secure which the securities were given has been paid in full; the creditor in the meantime is left in control of the debt, and all remedies for collection. A pro tanto assignment of subrogation will not be allowed.'' 25 R. C. L., 1318.

Under the trust fund doctrine of this state the question of whether the bank knew of the insolvency of the Trenary company or not is immaterial. *Woods v. Metropolitan National Bank, supra,* and cases there cited. The issue is, when did the Trenary company become insolvent?

The respondent bank had purchased these installment contracts from the Trenary company and under the guaranty agreement pursuant to which they had been purchased, the bank had a legal right on default being made in any payment to charge such payment to the Trenary company account, or to demand that such payment be made by the Trenary company, and this right continued so long as the Trenary company remained solvent. The exact time when the Trenary company became insolvent must be determined after both sides have had a full hearing. As we have heretofore stated, the record thus far indicates that the company became insolvent some time prior to the date of the actual assignment being made. Any charge back of delinquent installment payments by the bank or any acceptance by the bank of an installment payment from the Trenary company after the date of in-

solvency, and this regardless of whether the bank had knowledge of the insolvency or not, under our holdings in the cases above cited, became a preference. It is suggested in the record that many of these installment payments were made to the Trenary company by the car purchaser from whom they were due and by the company taken to the bank. Of course, as to such payments, the bank is entitled to receive them, and there is no preference as to such payments. But we think that, when it appears that such delinquent payments were made by the Trenary company, the burden is upon the bank to establish that the money thus received had been paid to the Trenary company as collecting agent for the bank.

As to respondents Lane and Trenary, the case is affirmed.

As to the respondent bank, we hold that the testimony was sufficient to put the bank upon its proof, and, as to the bank, the case is therefore reversed.

MITCHELL, C. J., FULLERTON, MAIN, and HOLCOMB, JJ., concur.