[No. 24499.   Department Two.   February 19, 1934.]

JOHN E. BELCHER, *as Receiver, Appellant,* v.
E. H. WEBB *et al., Respondents.*[1]

*J. W. Selden* and *John E. Belcher,* for appellant.
*Williamson, Freeman & Broenkow,* for respondents.

BLAKE, J. — Plaintiff was appointed receiver of
White Finance Corporation in March, 1932.   He
brought this action to recover on account of certain
alleged preferences.   Granting a motion for nonsuit,

[1]Reported in 29 P. (2d) 702.

the court entered judgment dismissing the action, from which plaintiff appeals.

For several years prior to November 18, 1930, the company had been engaged in the salary loan business. C. B. White was its principal stockholder, and, as manager, completely dominated its business. In the fall of 1930, he became desperately in need of funds to carry on the business. The company had theretofore been financed by the American Mortgage Company under an agreement whereby the finance company agreed to borrow from no one but the mortgage company without the latter's consent. As a result of this agreement, the finance company was indebted to the mortgage company to the extent of $55,000, for which it had pledged salary loan notes of the value of $66,000. The finance company was without operating funds, and had no resources to raise any. In this situation, the finance company procured the consent of the mortgage company to borrow money from its own stockholders.

At this juncture, Hipple, Berkheimer, Piper and Dower became stockholders of the finance company. The respondent Webb, as their trustee, entered into an agreement with the finance company whereby he, on behalf of his principals, agreed to loan money to the finance company.

This contract was not authorized by the board of trustees. In passing, we may say, however, that the receiver cannot question the validity of the contract on that ground, since the company accepted benefits under it. *McKinley v. Mineral Hill Consolidated Mining Co.,* 46 Wash. 162, 89 Pac. 495; *Weaver v. General Metals Merger,* 167 Wash. 451, 9 P. (2d) 778.

Among other things, the agreement provided that there should be deposited with the trustee, as collateral, salary loan notes to the value of $125 for every

$100 loaned to the finance company. It was also stipulated that the trustee should be the sole judge of the value of the collateral and its sufficiency to maintain the ratio.

This agreement was entered into November 18, 1930. At the same time, White, Hipple, Berkheimer, Piper and Dower entered into a voting trust agreement, whereby they assigned their stock for voting purposes to White, Webb and one Broenkow. In January, 1931, Webb's associates acquired half of the stock of the corporation, and at a stockholders' meeting held May 4, 1931, elected Webb, Hipple and Berkheimer as trustees of the company. Webb was made secretary-treasurer. White continued to be active in the management of the business. This change in the organization was brought about by White's appropriation of company funds to his own use. In spite of the precautions taken, however, he continued his peculations. As a result, he was displaced by Webb in the management of the company's affairs in August, 1931.

In the meantime, Webb, on behalf of his associates, had been making loans to the company in accordance with the agreement of November 18, 1930. He testified that, as each loan was made, he received salary loan notes as collateral, which he held in his exclusive possession; that, as the makers of such collateral notes made payments thereon to the finance company, the latter remitted the amount thereof to him; that he applied the amounts so remitted upon the company's indebtedness to him; and that, as the collateral notes were paid in full, they were returned to the finance company for cancellation, and other notes substituted to maintain the ratio of collateral to loans, as required by the contract of November 18th. It is clear from his testimony, and from the record as a whole, that it

was the purpose of Webb to maintain control and dominion of all the collateral notes delivered to him and to require payments by the makers thereof to be remitted to him. In other words, the payments made by the makers of the notes held by Webb as collateral were not left in the "unfettered control" of the finance company.

In the manner of handling the transactions, we find nothing that contravenes the rule of *Benedict v. Ratner,* 268 U. S. 353, 45 S. Ct. 566, and *Fales Co. v. Seiple Co.,* 171 Wash. 630, 19 P. (2d) 118. The fact that Webb and his associates were stockholders and trustees of the finance company does not render the transactions invalid. *Terhune v. Weise,* 132 Wash. 208, 231 Pac. 954, 38 A. L. R. 94. Nor does the fact that the finance company may have been insolvent at the time the loans were made affect the validity of the transaction. If the loans are, in fact, made and the security is, in fact, taken at the time the loans are made, the transaction is valid, even though the corporation is insolvent. *Horchover v. Pacific Marine Supply Co.,* 171 Wash. 330, 17 P. (2d) 915.

Of course, such transactions between a corporation and its stockholders and trustees will be subjected to the most rigid scrutiny by the courts. As we have seen, up to the time in August when White was ousted, the transactions between the corporation and Webb and his associates were within well recognized principles of law. There are certain actions on the part of Webb and his associates subsequent to that time that require consideration.

Shortly after they got rid of White, Webb and his associates organized Sound Discount Corporation. This company was organized for the purpose of engaging in the same kind of business as the finance com-

pany. Aside from that fact, however, we are unable to detect anything in the record to indicate that anything was done by, or through the means of, the discount corporation that would tend to injure the finance company. It is intimated that the purpose of organizing the discount corporation was to divert to it the clientele of the finance company. There is no evidence tending to prove such a purpose.

On October 14, 1931, Webb, declaring the ratio of collateral to loans had fallen below the ratio provided for in the contract of November 18, 1930, made demand on the finance company for payment of all its obligations to him. These consisted of several notes—some time, some demand—amounting in all to $55,994.38. Thereafter, Webb, in his capacity of trustee for his associates, made collections on the collateral notes and applied the proceeds to the finance company's indebtedness to him as such trustee.

The receiver complains of this procedure for several reasons. He asserts that the demand and the submission to it by the finance company were invalid, because Webb, Hipple and Berkheimer were occupying inconsistent positions; that, on the one hand, they were creditors making the demand, while on the other, as trustees of the corporation, they were submitting to it; that, without the valid consent of the corporation, Webb's collections, as trustee, on the collateral notes held by him amounted to a conversion, since the contract did not provide for such procedure; that Webb's legal recourse was to sell the collateral as pledged property and apply the proceeds on the finance company's indebtedness to him.

The situation challenges scrutiny, but it is not inherently wrong. *Terhune v. Weise, supra; Twin-Lick Oil Co. v. Marbury,* 91 U. S. 587. In the latter case, it is said:

"It is very true, that as a stockholder, in making a contract of any kind with the corporation of which he is a member, is in some sense dealing with a creature of which he is a part, and holds a common interest with the other stockholders, who, with him, constitute the whole of that artificial entity, he is properly held to a larger measure of candor and good faith than if he were not a stockholder. So, when the lender is a director, charged, with others, with the control and management of the affairs of the corporation, representing in this regard the aggregated interest of all the stockholders, his obligation, if he becomes a party to a contract with the company, to candor and fair dealing, is increased in the precise degree that his representative character has given him power and control derived from the confidence reposed in him by the stockholders who appointed him their agent. If he should be a sole director, or one of a smaller number vested with certain powers, this obligation would be still stronger, and his acts subject to more severe scrutiny, and their validity determined by more rigid principles of morality, and freedom from motives of selfishness. All this falls far short, however, of holding that no such contract can be made which will be valid."

We think the conduct of Webb, Hipple and Berkheimer withstands the closest scrutiny. The collateral, at the time the demand was made, had depreciated to an extent that there was no equity left in it for the finance company. The evidence is undisputed that Webb's associates will lose $25,000 to $30,000 when the collateral is finally liquidated. For him to pursue any course other than he did, would have been folly. For Berkheimer and Hipple to have resisted on behalf of the finance company, would have been futile. To have pursued the course of selling the collateral in the open market as pledged property, would not have been of the slightest benefit to the company. Such course

would only have imposed a greater loss on Webb's associates.

At the meeting of the trustees held October 14, 1931, Webb was voted, as secretary-treasurer of the finance company, a salary of $100 per month, effective from November 18, 1930. It is conceded that, subsequent to October 14, 1931, Webb received $1,100 from the finance company. Of this transaction, respondents say in their brief:

"The resolution passed by the board designated this amount for services rendered as secretary-treasurer. It was not, however, treated as such, nor was it set up on the books of the corporation in that manner. It was credited upon the books to Busch & Webb and paid in due course to that firm."

They seek to justify the payment as an auditing charge, due the firm of Busch & Webb, authorized by the contract of November 18, 1930. We do not think the payment can be so justified. Obviously, the amount was paid pursuant to the resolution of the board of trustees. That it was set up on the books of the company as a charge for services by Busch & Webb, could not change its character. The payment constituted a preference, and is recoverable by the receiver.

The judgment is affirmed, except as to the claim against Webb for $1,100. With respect to that, the evidence is sufficient to put Webb to his proof.

BEALS, C. J., TOLMAN, GERAGHTY, and HOLCOMB, JJ., concur.