E. P. WHITING, *as Receiver, Appellant,* v. CARL RUBIN-
STEIN *et al., Respondents.*[1]

[1]Reported in *109 P* (2d) 312.

C. E. H. *Maloy* and *Julian O. Matthews,* for appellant.

*Skeel, McKelvy, Henke, Evenson & Uhlmann,* for respondents.

SIMPSON, J.—The receiver of Suryan's Inc., a corporation, brought this action to recover the value of canned salmon alleged to have been received by defendants as preferred creditors of Suryan's Inc., an insolvent corporation.

The complaint contained allegations to the effect that Suryan's was a corporation; that it had been insolvent since the beginning of the year 1938; and that plaintiff was the receiver of the insolvent corporation.

It was further alleged that:

"Prior to July 31, 1938, Suryan's Inc., a corporation, was indebted to the defendants, Carl Rubinstein and Eliezer Caraco, copartners doing business under the firm name of Rubinstein & Caraco, and Seattle-First National Bank, in the sum of approximately $125,000 on account of loans made by said defendants to Suryan's Inc., Said indebtedness arose by reason of loans and advance made by Rubinstein & Caraco and Seattle-First National Bank to Suryan's Inc., a corporation, and said defendants had no security therefor. During the summer of 1938 Suryan's Inc., a corporation, was engaged in the business of catching and packing salmon in the Territory of Alaska and shipping said salmon to the City of Seattle for storage and warehousing. Between July 31, 1938 and September 15, 1938, Suryan's Inc., a corporation, by and through the defendant, R. D. Suryan, as its president and director, and its Board

of Directors, and with the active participation of said defendant, R. D. Suryan, transferred and delivered to said defendants, Carl Rubinstein and Eliezer Caraco, copartners doing business under the firm name of Rubinstein & Caraco, and Seattle-First National Bank, approximately 27,574 cases of canned salmon as security for the payment of said pre-existing debt due by Suryan's Inc. to said defendants, which salmon was of the value of approximately $130,964.60. Said defendants held said canned salmon in pledge and as security for such pre-existing indebtedness until between September 9, 1938, and March 31, 1939, they sold said salmon and from the proceeds of said sales applied and credited the sum of $106,273.65 upon the notes held by them of Suryan's Inc., a corporation."

In their amended answer, defendants denied generally the allegations of the complaint and set up three affirmative defenses.

The first affirmative defense alleged the execution and delivery of a financing agreement, dated March 5, 1938, entered into between Suryan's Inc., and defendants Rubinstein & Caraco, by the terms of which defendants agreed to assist Suryan's in financing its 1938 packing operations. It was alleged that, by the terms of the contract, the 1938 pack of salmon was pledged and assigned to respondents, as of March 5, 1938, for the purpose of insuring repayment of all advances made to Suryan's. It was then alleged that the parties agreed that the creation of the 1938 pack would be made possible only by reason of the financial assistance to be provided by defendants, and that the delivery of the salmon when packed was made to defendants pursuant to the agreement.

The second affirmative defense was that advances made by defendants, pursuant to the terms of the contract, for supplies, materials, and credits, wages, freight, and other items, exceeded the value of the canned salmon, and that defendants had a right to

offset against the sum sought to be recovered by the receiver all sums paid after the receipt of the salmon.

The third affirmative defense was that, even disregarding the agreement of March 5, 1938, the defendants had received the pack more than four months prior to the appointment of the receiver, without knowledge of insolvency, and that the receiver was not entitled to have the transfer set aside as a preference.

The reply put in issue the allegations contained in the answer.

Trial was had to the court, which entered a judgment of dismissal. Plaintiff has appealed.

The assignments of error are that the court erred in dismissing appellant's action, in denying appellant's motion for a new trial, and in entering a decree in favor of respondent Rubinstein & Caraco.

The facts involved in the appeal now before us are, in brief, as follows: Suryan's Inc., was engaged in the business of fishing for and canning salmon in Alaskan waters. Respondents were partners whose business was that of salmon packers and brokers. In the early part of 1938, the officers of Suryan's, having found that they did not have sufficient funds to care for their fishing and canning operations for the season of 1938, appealed to respondents for financial assistance. As the result of several conferences, respondents decided to underwrite the 1938 fishing and canning operations of Suryan's Inc., and entered into a contract to that effect.

The contract was dated March 5, 1938, and contained, among others, the following provisions: Paragraph one appointed respondents as agents of Suryan's for the purpose of handling and selling the 1938 pack. Respondents were authorized to use their own judgment in making sales. Paragraph two provided al-

lowances for swells, cash discount, labelling, brokerage, etc., to which respondents were entitled. By the terms of paragraph three, Suryan's agreed to carry on their operations to the best of their ability and gave the right to respondents to take over all the property and equipment and continue the operations under certain circumstances and conditions.

It was also agreed:

"All salmon and other products are to be shipped by First Party to Second Parties on straight bills of lading in the name and to the order of Second Parties at Seattle, Washington, who shall have and be entitled to full possession and control thereof. . . . In connection with making the advances against the pack as hereinafter provided, it is understood that Parties of the Second Part contemplate using the bills of lading, warehouse receipts and other evidences of title as collateral to procure the funds from the banks and others. It is understood that they have full right to do so and also to make all necessary deliveries of warehouse receipts and bills of lading in connection with making sales of the product."

The fourth paragraph provided for commissions to be paid respondents.

Paragraph five provided:

" . . . sell the merchandise on hand to reimburse them for the amount then owing them, and in the event of any termination of this contract, Second Parties shall have the immediate right to possession of all of the consigned cans and the contents thereof, together with all other materials, supplies and merchandise furnished."

Paragraph six provided:

"It is understood that the Parties of the Second Part are to make said advances of funds and furnish supplies in order to assist the Party of the First Part in its 1938 operation, the nature of which is now herein more fully defined. It is understood that First Party is obligated to purchase and recondition a scow or

barge with living quarters and storage space thereon; to recondition the boat 'Commander'; to place its equipment and fishing appliances in proper shape and condition for efficient use; to obtain ample insurance upon its properties and pack; to have available money with which to procure supplies and equipment, and said parties warrant that this will require an advance by Second Parties of approximately $30,000, and they agree to make such advance up to the sum of $30,000 on orders of First Party. This $30,000 shall be advanced for purchases, insurance, labor, all kinds of preparatory supplies, and operating expenses as needed, provided that the items shall be specified and the amounts paid only upon invoices carrying out the purpose of this contract, approved by Parties of the Second Part. . . . Second parties further agree to furnish or advance sufficient money to purchase cans and fibre boxes as needed by first party. As the pack is produced the same shall be promptly shipped and consigned to Parties of the Second Part at Seattle, Washington upon order bill of lading, and upon arrival and passing inspection, or sooner at their option, Second Parties agree to make further advances up to 65% of the then net market value of the salmon so actually consigned to and received by Parties of the Second Part. Any advances beyond the above percentage shall be optional with the Second Parties. This 65% advance shall be above and addition to the mortgage loan of $30,000. Said advances within the above percentage include the cost of cans and containers. So far as cans and other packing material and supplies are concerned, these shall be considered a consignment of raw material for the purpose of manufacture and title is reserved in Second Parties until the completed product, consisting of canned salmon, shall be sold and the Second Parties paid. Title to the contents shall follow the cans until such time as the contents shall be sold. The advances above mentioned shall include all freight, shipping expenses, insurance charges and other incidental expenses which Second Parties may pay for the account of First Party. . . . Whenever any salmon is sold all proceeds shall be used to pay the indebtedness, but

in the event the proceeds are not sufficient First Party agrees to pay the indebtedness in any event. All returns above the indebtedness owing Second Parties shall belong and be paid to Party of the First Part."

Paragraph seven provided for the payment of interest on advances.

Paragraph eleven provided:

"As long as any indebtedness remains owing to Second Parties, they shall be entitled to the possession and control of bills of lading, warehouse receipts, selling receipts and other evidences of title or ownership of said merchandise up to 35% in market value in excess of such indebtedness. The balance shall be released to 1st Party. Any possession of said fish or merchandise or any proceeds or avails thereof, or any documents representing the title, or right of possession thereof by the First Party during the existence hereof shall be in trust for the benefit of Second Parties to secure them for the advances and consignments herein made, as well as all other existing indebtedness, as herein provided."

Paragraph fourteen fixed the maturity date of the indebtedness as April 1, 1939.

Suryan's proceeded with their venture of fishing and canning. Respondents, from March 10, 1938, advanced large sums of money to care for the expenses of the fishing operations, and later were compelled to pay additional sums to care for the obligations incurred by Suryan's, during the time it was conducting its business in the north. The sums paid by respondents were in excess of the sixty-five per cent mentioned in the contract. Respondents received canned salmon from Suryan's July 8, 1938, and on various dates thereafter. The shipments, with one exception, were made to respondents. The exception occurred when Suryan's delivered salmon to the Seattle-First National Bank, Mount Vernon Branch. However, immediately after

this shipment was received by the bank, it was released to respondents.

When the fishing season closed, the floating cannery, "Commander," returned to Anacortes with a considerable load of canned salmon on board. At that time, Suryan's were indebted in a large amount to their workmen who had assisted in the summer's operations, and to fishermen from whom they had purchased fish. Respondents attempted to secure the fish, but were stopped by the employees' and fishermen's picket line. In order to secure the salmon on board the "Commander," respondents paid the amounts due the workmen and fishermen, many of whom had already received N.S.F. checks from Suryan's Inc.

In arranging for the payment of the obligations, Suryan's and respondents entered into an additional written agreement, the pertinent portions of which are:

"The facts underlying this agreement are as follows: On February · , 1938, an agreement was made between the Company and Rubinstein and Caraco by which the latter were appointed handling and selling agents for the company for its salmon pack for the year 1938 and by which also Rubinstein and Caraco made and contracted to make certain advances to assist in its operations for said season. The Alaska packing season has closed and the pack has all been brought down to Puget Sound and it appears that there is a substantial amount of indebtedness still unpaid and Rubinstein and Caraco have heretofore made more advances under the terms of said agreement than they originally contracted to loan. The balance of the Alaska pack is in the possession of Rubinstein and Caraco as a pledge and they intend to handle and dispose of the same and otherwise carry on the provisions of the contract, but the parties desire to cooperate in furnishing additional money to adjust, discount, compromise and otherwise clear up certain indebtedness of Suryan's, Inc. and to use the Puget Sound pack in

paying the expenses of marketing the Alaska pack and the new advances now made or to be made as herein specified.

"Now THEREFORE, to define the rights and duties of the parties, it is hereby understood and agreed as follows:

"(1) The agreement of February, 1938 is hereby ratified and affirmed and the possession of Rubinstein and Caraco of the Alaska pack under the terms of said agreement is hereby approved. The indebtedness of the company to Rubinstein and Caraco for advances heretofore made is agreed to be secured by a pledge of the Alaska pack now in their possession and nothing herein contained shall interfere with the priority and right of Rubinstein and Caraco in connection with such pledge.

"(2) Rubinstein and Caraco agree under the agreement of February, 1938, to finance the packing operation for the remainder of the 1938 season on Puget Sound using the pack thereof as security, first, for the advances made for such pack; second, for the expenses of the marketing of the Alaska pack hereinbefore referred to; and third, for application upon new advances made by all the parties to the company as hereinafter provided.

"(3) It is believed that there is a total remaining indebtedness for fish and labor for 1938 of Suryan's, Inc. amounting to $52,500. To help pay this indebtedness Rubinstein and Caraco agree to now advance $30,000 to Suryan's Inc. R. D. Suryan has borrowed from the bank and turned over to Rubinstein & Caraco for use in paying said indebtedness $15,000. $7500 is to constitute an advance under Rubinstein & Caracos financial contract to the company made up $2000 by Rubinstein and Caraco, $2000 by R. D. Suryan providing said amount by borrowing the same from Rubinstein and Caraco, $1000 by Frank Pickering, $1000 by Robin V. Welts and $1500 by John Seaman. As above stated, the parties believe that this amount is sufficient to take up all of the indebtedness for labor and for fish for the 1938 packing season of Suryan's, Inc., but should there by any further indebtedness none of the

213

parties hereto commit themselves to make any other or further advances for the purpose of clearing up such indebtedness.

"(4) The company has a certain insurance claim for $22,500, which has been assigned to Rubinstein and Caraco as additional security and which has been released and assigned to R. D. Suryan to the extent of $12,000, and to the extent that money is realized from said assignment of said insurance claim, it is to be applied in payment of said $15,000 loan by R. D. Suryan.

"(5) All moneys received by Rubinstein and Caraco or by Suryan's, Inc. from the remainder of the 1938 pack on Puget Sound are to be applied in paying the expenses of such Puget Sound pack and any advances of Rubinstein and Caraco for the purpose of meeting said expenses, together with the expenses of marketing the remainder of the 1938 pack. The balance of the proceeds from the Puget Sound pack received for application by Rubinstein & Caraco is to be applied, first to the $30,000 now advanced by Rubinstein and Caraco above mentioned; second, to any balance owing on the R. D. Suryan $15,000 and the $7500 advanced by the syndicate as referred to in paragraph No. 3 hereof, the same to be retired pro rata. In computing the amounts to be paid said Suryan shall be considered as having a claim equal to the $15,000, less the amount realized on the insurance claim and applied upon said indebtedness.

"(6) Subject to the foregoing, the $30,000 advanced by Rubinstein and Caraco, the $15,000 advanced by Suryan and the $7500 advanced by the Syndicate will be treated as an advance through Rubinstein and Caraco under the terms of the contract of February, 1938, but subject nevertheless to the claim of Rubinstein and Caraco for advances against said Alaska pack already made.

"(7) All fish constituting the Puget Sound pack shall be promptly delivered to Rubinstein and Caraco who will handle the same under the terms of the agreement of February, 1938 as modified and supplemented by this agreement.

"(8) It is understood that there may be as a result of

all packing operations for the year 1938 some loss and an inability on the part of the company to pay a part of the moneys loaned to it.  It is understood that the parties hereto reserve all their rights under the agreement of February, 1938, as well as this supplemental agreement and all rights given them by law to effect the collection of the balance of said moneys, if any, and nothing herein contained shall constitute a waiver of such rights or obligations nor any obligations on the part of Rubinstein and Caraco to finance 1939 fishing operations."

It is apparent that the contract referred to in the above agreement was that dated March 5, 1938.  The evidence shows that Suryan's were insolvent at the time the first contract was entered into, and that it remained in that condition until the appointment of the receiver.

Appellant contends that there was no actual or constructive delivery of the personal property to the pledgee at the time of the advances, and that the amounts advanced by respondents constituted a pre-existing indebtedness.

Before 1931, it was the rule in this state that the assets of an insolvent corporation constituted a trust fund for the benefit of its creditors, and that transfers or mortgages which had the effect of preferring one creditor over another were voidable.  *Conover v. Hull*, 10 Wash. 673, 39 Pac. 166, 45 Am. St. 810; *Nixon v. Hendy Machine Works*, 51 Wash. 419, 99 Pac. 11; *Benner v. Scandinavian American Bank*, 73 Wash. 488, 131 Pac. 1149, Ann. Cas. 1914D, 702; *Simpson v. Western Hdwe. & Metal Co.*, 97 Wash. 626, 167 Pac. 113; *Jones v. Hoquiam Lbr. & Shingle Co.*, 98 Wash. 172, 167 Pac. 117; *Williams v. Davidson*, 104 Wash. 315, 176 Pac. 334, 181 Pac. 874; *Woods v. Metropolitan Nat. Bank*, 126 Wash. 346, 218 Pac. 266; *May v. Rudell*, 149

Wash. 393, 270 Pac. 1041; and *Jensen v. American Bank of Spokane,* 157 Wash. 240, 288 Pac. 660.

In 1931, the legislature passed a trust fund act. Laws of 1931, chapter 47, p. 160, Rem. Rev. Stat., § 5831-2 [P. C. § 4532-2]. The new statute differs from the trust fund doctrine in that it is now necessary to show that the preferred creditor had reasonable cause to believe that the transfer would effect a preference, provided the preference took place more than four months before the application for the appointment of the liquidating officer. As to preferences made within four months of such application, no knowledge on the part of the preferred creditor is necessary.

In the case at bar, evidence was introduced by appellant to show that respondents knew, or had reason to know, that Suryan's Inc., was insolvent at the time the transfers were made to them. However, the action was dismissed on the ground that no preference was made therefor, and the question of their knowledge was not material.

An exception to the preference rule is presented in cases in which the creditor obtains the pledge or mortgage of the property belonging to the corporation as security for a present consideration. *Terhune v. Weise,* 132 Wash. 208, 231 Pac. 954, 38 A. L. R. 94; *Smith v. National Bank of Commerce,* 142 Wash. 428, 253 Pac. 644; *Jensen v. American Bank of Spokane, supra; Horchover v. Pacific Marine Supply Co.,* 171 Wash. 330, 17 P. (2d) 915; *Belcher v. Webb,* 176 Wash. 446, 29 P. (2d) 702; *Seattle Ass'n of Credit Men v. Bank of California,* 177 Wash. 130, 30 P. (2d) 972; *Philip v. Seattle,* 195 Wash. 386, 81 P. (2d) 279.

The rule relative to the exception is laid down in 19 C. J. S. 1107, § 1388, as follows:

"A corporation, although insolvent, may properly make transfers or mortgages of its property in good

faith to secure present advances of money to be used in paying its debts, in extricating itself from its difficulties, or otherwise in continuing the business. Questions arising on attempt by an insolvent corporation to prefer one creditor over another have no relation to transactions of this character."

In support of his first contention, appellant argues that, to make a valid pledge of tangible personal property, it is necessary to deliver the actual or constructive possession of the personal property to the pledgee, and that in this case no pledge was created until the salmon reached the possession of respondents. In this regard, he cites: *Heilbron v. Guarantee Loan & Trust Co.,* 13 Wash. 645, 43 Pac. 932; *Hastings v. Lincoln Trust Co.,* 115 Wash. 492, 197 Pac. 627, 18 A. L. R. 583; *Ackerson v. Babcock,* 132 Wash. 435, 232 Pac. 335; *Qualley v. Snoqualmie Valley Bank,* 136 Wash. 42, 238 Pac. 915; *Hodge v. Truax,* 184 Wash. 360, 51 P. (2d) 357, 103 A. L. R. 420. An examination of these cases reveals that they do not pass upon the question of a constructive or symbolic pledge such as we have in the case at bar.

"What will amount to a sufficient delivery of a pledge is often a nice question of law and fact, but the general criterion is that the delivery should be as complete as the nature of the article bailed admits of. The pledgee's possession, to be effective either for notice or to give validity at law to the pledge, must be complete, unequivocal, and exclusive of the pledgor's possession in his own right, and the mere setting of a portable article aside, or the pledgor consenting to bail it as the bailee of the other, there being in fact no transfer of the custody, however such acts might in case of a sale amount to delivery, is not sufficient in case of a pledge or pawn, the very essence of which is deposit. Where property is pledged, the delivery need not be made contemporaneously with the pledge, and, if made thereafter, it relates back to the date

when the contract or pledge was made." 21 R. C. L. 644, § 11.

"Although there cannot be a pledge, technically speaking, of a chattel not in existence, there may be a contract in the nature of an agreement to pledge, which will attach to the chattel as soon as it is produced. Thus, where it was stipulated by a brick-maker that the lessees of a brickyard should retain the bricks to be made by him as security for their advances to the brick-maker, the bricks were held to be pledged as fast as they were manufactured." Jones on Collateral Securities (3d ed.), 39, § 30.

The same authority states in § 28:

"As between the parties themselves an actual delivery may not be necessary. The possession may be regarded, constructively, where the contract places it. Upon this point Mr. Justice Loomis said: 'We have observed, however, for several years a growing laxity on the part of judges and jurists in the application of the principles of constructive pledge delivery, until now it must be confessed there are authorities of great weight and respectability that hold that, as between the parties themselves, an actual delivery may not be necessary, and that the possession may be regarded constructively where the contract places it.' "

Again, in § 33, it is stated:

"That the goods are unfinished when given in pledge, and are to be finished afterward at the expense of the pledgor, is no obstacle to confirming and maintaining the pledge."

In *Johnson v. Burke Manor Bldg. Corp.*, 48 F. (2d) 1031, 83 A. L. R. 1273, we find the following statement:

"A pledge or contract for a pledge, ineffectual for want of delivery, may be rendered valid by a subsequent delivery, even as against an intermediate creditor at large of the pledgor. Of course, such subsequent delivery would not prevail against a creditor who had, between the time of the making of the contract and taking possession under it, acquired a specific

lien upon the thing pledged by attachment or levy of execution. The only other obstacle which could prevent such a transaction from being effectual would be the intervention of fraud. Jones on Pledges, § 33."

The requirements necessary to constitute an equitable assignment are stated in 6 C. J. S. 1101, § 58, as follows:

"No particular form is necessary to constitute an equitable assignment, and any words or transactions which show an intention on the one side to assign and an intention on the other to receive, if there is a valuable consideration, will operate as an effective equitable assignment, . . ."

In *Anderson v. Farmers State Bank*, 130 Wash. 236, 226 Pac. 1011, we find the facts to be that Hadley was indebted to Anderson on notes secured by a chattel mortgage on farm machinery. The notes were in default. Anderson agreed to refrain from foreclosing his mortgage, in consideration of an agreement that the bank would release a portion of a mortgage it held upon Hadley's wheat crop, so that the chattel mortgage could be paid. It was agreed that wheat of sufficient quantity to pay the notes would be delivered to Anderson as soon as the crop was delivered to the warehouse and the receipts sent to the bank. In construing the agreement, this court stated:

"If that did not constitute an equitable assignment it is impossible to perceive what would. Thus in 5 C. J., p. 909, an equitable assignment is defined as follows:

" 'In order to work an equitable assignment there must be an absolute appropriation by the assignor of the debt or fund sought to be assigned to the use of the assignee. The intention of the assignor must be to transfer a present interest in the debt or fund or subject-matter; if this is done the transaction is an assignment; otherwise not.' "

In *Terhune v. Weise,* 132 Wash. 208, 231 Pac. 954, 38 A. L. R. 94, we said:

" 'Where a party by express agreement sufficiently indicates an intention to make specific property a security for a debt or other obligation and promises to transfer such property as security, equity impresses the property with an equitable lien in case security is not given.' "

From these authorities, we conclude that a pledge of personal property not then in being becomes effective as soon as it is produced and delivered into the actual or constructive possession of the pledgee, provided that such subsequent delivery has not encountered the rights of creditors who had, between the execution of the contract and taking possession thereunder, acquired a lien upon the pledged property by attachment or levy of execution.

We will next consider appellant's contention that the loan to Suryan's constituted a preexisting indebtedness.

Of course, the contractual obligation was created before the canned salmon was delivered to respondents. That fact, however, did not make the debt a preexisting one, for the reason that it was made for the specific purpose of financing the fishing business of Suryan's during the season of 1938, and its payment was secured by the pledge of the season's catch. The pledge being legal, it follows that, as to the fish caught and delivered, the debt evidenced by the contract of March 5, 1938, was not preexisting in so far as the pledged property was concerned.

The issues presented by this appeal have been decided by this court adversely to appellant's contention.

In *Terhune v. Weise, supra,* the facts disclose that Weise advanced to the plumbing company sums of money to enable it to obtain materials and pay for

labor necessary to install heating units. In order to protect the loan, the plumbing company assigned to Weise sixty per cent of the accounts receivable from the moneys obtained as a result of the performance of the contract. The assignments of the contracts were not delivered to Weise until long after the funds were advanced. Weise made collections upon the assigned contracts at times when the plumbing company was insolvent. The receiver sought to recover, as preferences, the amounts collected by Weise. This court upheld the agreement. That case so clearly defines the principles of law which must be applied here that we quote from it at length:

"This court, early in its existence, firmly declared its allegiance to the trust fund theory; that is, that the assets of an insolvent corporation are a trust fund for the benefit of all of its creditors, and that no creditor can secure a preference over others. *Thompson v. Huron Lumber Co.*, 4 Wash. 600, 30 Pac. 741, 31 Pac. 25; *Conover v. Hull*, 10 Wash. 673, 39 Pac. 166, 45 Am. St. 810. No court has been more consistent in adhering to that doctrine and none has gone farther in applying it. But we feel that the limit of its extension has been reached and to further widen its scope is to impair the doctrine itself and to unjustly hamper the operation of a corporation which, in good faith, may be attempting to weather a financial storm, or struggling corporations attempting to start upon their commercial voyages. It would be unwise to apply the doctrine so rigorously that such corporations could not obtain financial relief by giving security to those who might be willing to extend help if they could be protected. It is common knowledge that many a struggling concern could be placed upon a sound financial foundation if it might, in exchange for the needed help, use its assets without the danger that, if the attempt prove unsuccessful, those assets would be taken back from the person extending the relief and he be compelled to share with the general creditors in what might be distributed under a receivership. This court has never

said, and is now unwilling to say, that where a *bona fide* transaction is entered into between an insolvent corporation and a person willing to exchange for the company's assets the needed financial assistance, that such agreements are illegal or void for the reason that they constitute a preference. To hold otherwise would compel the repayment of all sums paid by an insolvent corporation in exchange for any labor or material. The basis upon which the trust fund doctrine rests is that one creditor during insolvency has caused a depletion of the assets of the insolvent concern to the detriment of the other creditors. Where there has been no depletion the basis of the doctrine has been removed, and therefore, where a present valuable consideration passes to the insolvent corporation from the creditor, the amount paid by, or secured from, the insolvent to such creditor cannot constitute a preference.
. . .

"To the same effect see 14-A C. J. 908. This court, in *Lloyd v. Sichler*, 94 Wash. 611, 162 Pac. 979, recognized the right of a creditor, whose transaction with the company did not modify or change the relation of the parties to the disadvantage of other creditors, to make such an arrangement. In such cases, the trust fund is in no way depleted, the assets of the company are not lessened but are merely changed in character; and, in the instant case, in place of accounts collectible under a contract, the company received cash for which it was able to pay for the labor of its workmen and persons who had furnished materials and supplies. As a matter of fact, by the contract the assets of the company were preserved in a great deal better condition than they would otherwise have been. . . .

"The next reason advanced for the illegality of this contract is that the security turned over to the appellant was not delivered at the time of the advance, and that therefore the doctrine that an officer of an insolvent corporation may advance money for the benefit of the company to be used by it in paying its creditors and enable it thus to continue business, and may take security *at the time* for the reimbursement of such advances, provided such advances are made in

good faith, does not apply, for the reason that the advances were made prior to the taking by him of the security. The answer to this is that the agreement must be looked to to determine what was the real situation. It was there provided that, for advances to be subsequently made by the appellant, he was to receive assignments of various contracts as they came into existence. By the very nature of the business they were not in existence at the time the agreement was made. The assignments were made under the terms of the contract as soon as money which could be assigned was due on those contracts. Since the parties intended to make specific security for the advances, even though the assignment or the transfer of the security was not made at the actual moment the money was lent to the company, yet equity will impress the property with the obligation created by the contract and compel the observance of the contract's terms. *Bach & Sons v. Smith-Pattison Mfg. Co.,* 21 Ohio Cir. Ct. 258. In *In re Farmers' Supply Co.,* 170 Fed. 502, the syllabus reads:

" 'Where a party by express agreement sufficiently indicates an intention to make specific property a security for a debt or other obligation and promises to transfer such property as security, equity impresses the property with an equitable lien in case security is not given.'

"Consequently, we have not here a case where the creditor is receiving security or being paid for an antecedent debt. The creation of the debt and the payment of it were by this agreement, in legal effect, contemporaneous acts."

The facts in *Smith v. National Bank of Commerce,* 142 Wash. 428, 253 Pac. 644, involved an action by the receiver of an insolvent corporation to recover assets from a bank which had been appropriated by the bank pursuant to a general loan and collateral agreement. The bank had advanced funds to the corporation to carry on its business after the corporation had become insolvent. The money was placed in the general check-

ing account of the insolvent. Thereafter, the bank appropriated funds from the account to discharge obligations due it from the insolvent, and, when the receiver was appointed, took additional funds from the account and applied them in satisfaction of the amounts then due. This court held that the transactions were not preferences and, in so doing, stated:

"Respondent loaned this money to a corporation which was then actually insolvent (not knowing that fact, it is true, but the question of knowledge is immaterial, as we have several times held), and the money loaned went to swell the assets of the corporation. The loans were made upon the faith and credit of the lien created by the general loan and collateral agreement, and when the balance in the checking account was taken in payment and reduction of the notes, the respondent took back only a part of what it had theretofore contributed. In other words, the trial court found that the corporation was insolvent on January 1, 1924. Its then assets were a trust fund, and if a receiver had then been appointed they would have been distributed accordingly. Respondent afterwards by its loans increased the assets, and later, but still before insolvency proceedings were commenced, took back in repayment a part of that increase. How could the other and general creditors be injured? The presumption must be that they were benefited by the transaction taken as a whole.

"The recent case of *Terhune v. Weise*, 132 Wash. 208, 231 Pac. 954, clearly exemplifies this exception to the rule. is exactly in point and is controlling in this case.

"An argument is advanced upon the supposed equities of those who made possible the deposit by the corporation of the fund out of which respondent sequestered the payments. The answer is that the bank knew nothing of these matters and the corporation might, and perhaps should, if it recognized such equities, have made a special deposit for the benefit of those who had contributed toward the securing of the fund.

"On the authority of the *Terhune* case, the judgment is affirmed."

In *Horchover v. Pacific Marine Supply Co.*, 171 Wash. 330, 17 P. (2d) 915, the plaintiff, as trustee in bankruptcy, brought the action against the pledgee to recover the amount collected by it as a voidable preference. That case involved a verbal assignment or pledge of fish to be caught and packed during the 1930 Alaska fishing season. The loans were to be available as soon as the pack reached Seattle and warehouse receipts therefor were in the hands of the bank. Thereafter, during the months of April and May, 1930, the assignees furnished supplies to the banking company of the value of several thousand dollars. We based our decision upon the holding in *Terhune v. Weise, supra,* and stated:

"The supplies furnished and credit extended by respondent to the Packing Co. went to increase the assets of the latter. Without such supplies and credit, the fund from which respondent was paid would never have come into being. Respondent was merely reimbursed from a fund which it helped to create by making it possible for the Packing Co. to proceed with its 1930 operations. A fund, to be assignable, does not have to be actually existent; it is sufficient if it is potentially existent. 5 C. J. 854, 924. Here, the respondent was paid from a fund that was brought into potential existence by its own acts, in the furnishing of supplies and extension of credit to the Packing Co. for the 1930 operations."

We again recognized the exception to the trust fund doctrine in *Belcher v. Webb,* 176 Wash. 446, 29 P. (2d) 702; *Seattle Ass'n of Credit Men v. Bank of California,* 177 Wash. 130, 30 P. (2d) 972; and *Philip v. Seattle,* 195 Wash. 386, 81 P. (2d) 279.

Appellants insist that the payments made in compliance with the agreement of September 6, 1938,

amounted to a preference, in that the obligations of Suryan's had been incurred prior to the time of their payment by respondents. He cites in support of his contention *McKnight v. Shadbolt,* 98 Wash. 665, 168 Pac. 473, and *Seattle Ass'n of Credit Men v. Bank of California, supra.*

There would be much force in counsel's argument if the payment of its debts, incurred during the time Suryan's were engaged in fishing and canning, were paid in compliance with an independent contract. The payments were made, however, in compliance with the original contract of March 5, 1938. The contract of September 6, 1938, was not a new one, nor did it create a new or independent obligation. It was made for the purpose of defining the rights and duties of the parties who had entered into the original agreement.

Appellant calls attention to *Ropes, Inc. v. Rubinstein,* 4 Wn. (2d) 380, 104 P. (2d) 329, and argues that it is controlling here. It is true that the contract here involved was construed in that case. However, its interpretation related only to the first shipment of salmon. The liability of these respondents was, in fact, founded upon an assignment made by Suryan's to Ropes, Inc., and accepted by Rubinstein & Caraco.

The advances of money and debts paid by respondents did not amount to a voidable preference. The sums supplied by respondents were for the purpose of enabling Suryan's to carry on their business during the year 1938. The salmon secured by them did not take any corporate property from which the creditors of Suryan's were entitled to recover their accounts. In fact, the fish received by Suryan's was the product of respondents' capital and not that of Suryan's or the general creditors.

226

The judgment of the trial court was correct and is affirmed.

BLAKE, BEALS, JEFFERS, and DRIVER, JJ., concur.

[No. 27941. Department Two. January 25, 1941.]

