[No. 28270.   Department One.   May 5, 1942.]

E. P. WHITING, *as Receiver, Appellant,* v. SEATTLE-FIRST NATIONAL BANK, *Respondent.*[1]

*C. E. H. Maloy* and *Julian O. Matthews,* for appellant.

*Poe, Falknor, Emory & Howe* and *Welts & Welts,* for respondent.

ROBINSON, C. J.—This action was instituted by the receiver of Suryan's Inc., an insolvent corporation (which will hereinafter be referred to as Suryan's), to recover preferences alleged to have been received

[1]Reported in 125 P. (2d) 656.

by the Seattle-First National Bank as a creditor of the company.

In his complaint, the receiver alleges that, since 1936, Suryan's, a Washington corporation, has been insolvent, which fact was known to the defendants; that, prior to August 12, 1937, the corporation was indebted to defendant bank in the approximate sum of $141,300; that the indebtedness evidenced by promissory notes was unsecured, except $25,000 of that sum may have been secured by a mortgage upon a vessel called "M/V Commander."

It was further alleged that, during the summer of 1937, Suryan's transferred and delivered to defendant bank in excess of 22,451 cases of salmon of the value of $101,025.33, as security for the preexisting indebtedness; that the bank sold the salmon and from the proceeds of the sale applied and credited the sum of $101,025.33 upon the notes given by Suryan's; that at that time the bank knew, and had reasonable cause to know, of the insolvency of Suryan's; and that the selling of the salmon constituted a preference over other creditors of Suryan's. Plaintiff demanded judgment in the sum of $101,025.33, being the alleged value of the salmon delivered to the bank.

In their answer, the defendants denied all allegations relative to the preference and insolvency, and, by way of an affirmative defense, alleged that, during the year 1937, the bank made certain advances to Suryan's to meet its payroll and other operating expenses, and received for the advances the pledge of the salmon referred to in plaintiff's complaint; that, in connection with the pledge, Suryan's executed a pledge agreement under the provisions of which the bank was given the right to sell the salmon theretofore pledged; that the bank did later sell the salmon and applied the proceeds of the sale to the obligations owing by Suryan's.

In his reply, the receiver denied the allegations contained in appellant's affirmative defenses.

The case, tried to the court, resulted in a judgment dismissing the action. The receiver has appealed. The assignments of error are in dismissing appellant's action, in denying appellant's motion for new trial, and in entering a judgment in favor of respondent, Seattle-First National Bank.

The facts, as shown at the trial, may be stated, in outline, as follows: Suryan's was a corporation engaged in the salmon canning business at Anacortes, Washington. In the fall of 1936, it decided to construct a floating cannery, called the "Commander," and during the 1937 fishing season, engage in salmon canning operations in the waters of southwestern Alaska. It had practically no cash assets. Realizing that funds would have to be obtained to finance its operations, it made arrangements with the bank to make advances upon pledge of the salmon thereafter to be canned and shipped to Anacortes or Seattle. The agreement was that the salmon should be consigned to the bank and warehouse receipts issued in its name and held by it as security for advances made by the bank. The evidence establishes beyond any doubt that all advances, whether made prior or subsequent to the arrival of any salmon at Seattle or Anacortes, were to be secured by the salmon.

The cost of constructing the "Commander" was approximately $75,000, $25,000 more than had been originally anticipated. The subscribers to the increased stock contributed approximately $37,500. On April 6, 1937, the bank loaned the company $6,000; on May 18, 1937, $4,000, and on May 21, 1937, $15,000. On May 21, 1937, the bank took a mortgage on the "Commander," securing payment of these funds. All of the funds so advanced by the bank were used in completing the

"Commander." The mortgage was filed in the office of the United States customs at Juneau, Alaska, May 25, 1937. The "Commander" sailed for Alaska about May 25, 1937.

Prior to this date, the company, unbeknown to the bank, had incurred bills in an amount between $29,000 and $35,000. Pickering, vice-president of the bank and manager of its Mt. Vernon branch, who represented the bank in all of these transactions, and who also was a subscriber to the increased stock of the company in the amount of $7,500, learned that there were outstanding unpaid bills shortly before the "Commander" sailed for Alaska. Between May 27, 1937, and August 7, 1937, the bank advanced sums amounting to $12,300. It reimbursed itself for these advances out of the proceeds of the first shipment of salmon which arrived in Seattle August 11, 1937. From and after August 17, 1937, it advanced to the company against bills of lading and warehouse receipts actually in its possession approximately $70,000. All advances made by the bank were used to pay expenses incurred in producing the salmon, such as the price of fish purchased from fishermen, the wages of the crew, which became payable at the end of the season, supplies furnished to the "Commander," etc.

The 1937 operations were not as successful as had been anticipated. At the end of that year, the company owed debts in a large sum of money. The 1937 debts which still remain unpaid amount to approximately $17,234.36. None of the creditors, however, took any steps to place the company in the hands of a receiver. Those creditors who threatened to attach the "Commander" were pacified by payment of part of their claims. The company continued in business, and, in 1938, again sent the "Commander" to Alaska and

engaged in salmon canning operations. During that year, it borrowed from Rubinstein & Caraco, salmon brokers, upwards of $150,000. At the end of 1938, the company owed debts in a large sum of money, which it was unable to pay. The bank foreclosed its mortgage on the "Commander" and purchased the vessel at the foreclosure sale for the amount of its mortgage. Application for the appointment of a receiver was filed May 19, 1939, and appellant was appointed receiver June 2, 1939. Claims of creditors filed with the receiver amount to approximately $100,859.26. The assets of the company are worth less than $1,000.

Between December 24, 1937, and August 11, 1938, as offers for salmon were obtained by Suryan's, the bank issued "banker's orders" to the warehouse company authorizing it to release to Suryan's approximately 6,384 cases of salmon. The value of this salmon was $44,724.26. Simultaneously with the issuance of each order, the bank received from Suryan's a "trust receipt," which stated:

"Original            Trust Receipt            No.................

"Received in Trust from Seattle-First National Bank the following goods and merchandise, their property: Released from .............................................Warehouse,
Seattle, Washington
Under date .................................
From Warehouse Receipt No..................., dated..................
Upon the following terms and conditions:

"In consideration thereof we are to hold said merchandise for and on account of said Bank, and subject at all times to the orders of said Bank, with liberty, however, to us to sell the same. The specific avails thereof, whether in cash, notes or open accounts, as soon as received to be transferred and delivered by us to said Bank. The title to said merchandise, and the avails thereof, to be and remain in said Bank. We are to keep said merchandise insured at our expense, loss, if any, to be payable to said Bank.
Signed.................................................................."

When the proceeds of the released salmon were received by the bank, they were applied on the company's indebtedness, theretofore secured by the warehouse receipts.

The complaint alleged that the company was insolvent at all times subsequent to September, 1936; that the salmon was pledged to secure preexisting indebtedness, and that the bank at all of the times when it received transfers of salmon and the proceeds thereof, which it applied on the company's indebtedness to it, had reasonable cause to believe that it was receiving a preference over other creditors of the company, and the receiver prayed judgment for $101,025.33.

The trial court found that, on May 15, 1937, the company was unable to pay its obligations in the regular course of business, and was insolvent; that, on August 11, 1937, when the first shipment of salmon was received by the bank, the bank had reasonable cause to believe that the company was insolvent, but that at no time did the bank have reasonable cause to believe that it was receiving a preference. The court held that, in contemplation of law, the salmon was pledged contemporaneously with the making of the loans, and entered judgment dismissing the complaint.

Appellant's contentions on this appeal are that the mortgage on the "Commander" was given to secure a preexisting debt of $10,000; that payment of the loans, aggregating $12,300, made between May 27, 1937, and August 7, 1937, out of the proceeds of the salmon received August 11, 1937, was the payment of a preexisting indebtedness, and that application of the proceeds of the "released" salmon upon the indebtedness owing the bank was also the payment of a preexisting indebtedness; that the company, at all of the times when these transfers were made, was insolvent, and that the bank had reasonable cause to believe that it

was receiving a preference, and appellant asks judgment for $67,024.56.

The facts of this case are not substantially different from those of *Whiting v. Rubinstein*, 7 Wn. (2d) 204, 109 P. (2d) 312. In this case, as in that, the funds to be secured by the salmon were advanced for the purpose of, and were used in, the production of the salmon—and, in this case, the funds that were secured by the mortgage on the "Commander" were used in the construction of that vessel. We held in that case that, where the salmon was subsequently transferred to the pledgee in pursuance of the pledge agreement, and the transfer took place more than four months prior to the application for the appointment of a receiver, there was no preference, within the meaning of our trust fund doctrine. See, also, *Union Trust Co. of Maryland v. Townshend*, 101 F. (2d) 903.

We agree with the trial court that the bank had no reasonable cause to believe that it was receiving a preference. Under the circumstances, and having in mind particularly the case of *Whiting v. Rubinstein, supra,* there seems no good reason to further prolong this opinion.

The judgment appealed from is affirmed.

BLAKE, MAIN, SIMPSON, and DRIVER, JJ., concur.